GRODT & MCKAY REALTY, INC.,[1] PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DAVIS EQUIPMENT CORPORATION,[1] PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16210–79, 4852–80.    Filed December 7, 1981.

*William S. Smith, William B. Serangeli*, and *Charles H. Liebold*, for the petitioners.
*Genelle F. Schlichting*, for the respondent.

HALL, *Judge*:[*] Respondent determined the following deficiencies in petitioners' income taxes:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Grodt & McKay Realty, Inc | 16210–79 | 1976 | $6,885.24 |
| | | 1977 | 13,567.83 |
| Davis Equipment Corp | 4852–80 | 1976 | 3,171.43 |
| | | 1977 | 4,464.49 |

The issues for decision are:

(1) Whether transactions in which petitioners purportedly purchased cattle were bona fide sales or sham transactions;

---

[*] This opinion was prepared by Judge Hall during her tenure of office.
[1] These cases have been consolidated for purposes of trial, briefing, and opinion.

(2) In the alternative, whether petitioners' cattle-breeding activities were activities engaged in for profit;

(3) In the alternative (a) whether nonrecourse purchase-money notes used to purchase the cattle were so contingent as to (1) prohibit their inclusion in petitioners' bases for depreciation and investment tax credit purposes, and (2) prohibit deductions for interest payments thereon; and (b) whether petitioners are entitled to deduct management fees in excess of the amounts allowed by respondent.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Grodt & McKay Realty, Inc. (Grodt & McKay), and Davis Equipment Corp. (Davis Equipment) each had its principal place of business in Des Moines, Iowa, when it filed its petition. Both Grodt & McKay and Davis Equipment keep their books and file their income tax returns using the accrual method of accounting and the calendar year. During all relevant times, both corporations were taxed as regular corporations.

Grodt & McKay is an Iowa corporation primarily engaged in the sale of real estate. During 1976, Paul O. Grodt was the president and sole shareholder of Grodt & McKay. During 1977, Grodt owned 80 percent of Grodt & McKay's outstanding stock, and the remaining 20 percent was owned by a trust established by Grodt for the benefit of his heirs.

Davis Equipment is an Iowa corporation primarily engaged in the retail sales and servicing of fertilizer application equipment. During all relevant times, Roger L. Davis was the president and sole shareholder of Davis Equipment.

On December 8, 1976, T. R. Land & Cattle Co., Inc. (Cattle Co.), issued a private placement memorandum describing a private offering of an investment opportunity in a cattle-breeding program. The memorandum detailed Cattle Co.'s intention to establish a large-scale cattle-breeding program by selling 35 "units" of cattle at $30,000 per unit, with each unit consisting of five breeding cows. Cattle Co. proposed to retain all management responsibility for the cattle,[2] and it offered to

---

[2]The memorandum specifically states that Cattle Co.'s management services are optional.

finance up to $28,500 of the purchase price with a promissory note payable out of the profits from the cattle-breeding operations. A "Sales Agreement," a "Management Agreement," a "Promissory Note," and a "Security Agreement" made up the basic instruments embodying the arrangement between purchasers and Cattle Co.[3]

On December 9, 1976, Grodt & McKay executed documents pursuant to which it purchased[4] two units of cattle in Cattle Co.'s program for $30,000 per unit. On December 11, 1976, Davis Equipment purchased one unit of cattle for $30,000.

Under the provisions of the sales agreements, petitioners' units of breeding cattle[5] consisted of five purebred Angus cows (the basic herd). Cattle Co. agreed to promptly replace any nonbreeder[6] in the basic herd with a cow of comparable quality.

Grodt & McKay's purchase price of $60,000 was payable as follows: $2,000 cash on execution of the sales agreements and the balance ($58,000) in the form of a nonrecourse promissory note. Davis Equipment agreed to pay $1,500 cash on execution of the sales agreement and the balance of the $30,000 purchase price ($28,500) in the form of a nonrecourse promissory note. Petitioners remained liable on the promissory notes whether or not Cattle Co. performed under the management agreement.

Pursuant to the sales agreements, Cattle Co. agreed that it would, whenever possible, artificially inseminate each cow in

---

However, the management services were considered an integral element of the arrangement between Cattle Co. and purchasers of the units, and the memorandum and the proposed agreements fully contemplate that the management services will be part of the overall undertaking.

[3]The specifics of the cattle-breeding program as explained in the memorandum (including the sample documents attached thereto) are materially different from some of the provisions of the program found in the actual documents executed by petitioners. For this reason, the text of our findings of fact will rely on the actual documents executed.

[4]Use of such terms as "purchase," "sale," "own," "petitioners' herds," "interest," "principal," "price," "downpayment" and "management fee," should not be construed as carrying any conclusion as to the legal effect of the documents or transactions involved.

[5]The sales agreements contain no definition of "breeding cattle." The memorandum, on the other hand, states that "Each animal in the basic herd will be between 1 and 12 years of age at the time of sale and will be mature for breeding." Black Angus heifers generally reach breeding age between 18 and 20 months.

[6]The sales agreements define a nonbreeder as a cow or heifer which does not become pregnant after six consecutive breeding attempts or within 6 months of the date of the sales agreement, whichever occurs first. An agreement to replace a nonbreeder is standard practice in the industry.

the basic herd with semen from a quality bull that would hopefully improve the calf crop of the basic herds. The sales agreements contained the following warranties and guaranties, and the following provisions regarding early termination of the management agreements:

2. The animals in the Basic Herd are represented and warranted to be breeders capable of being registered with the Black Angus Association. The Herd will remain registered with the Black Angus Association under the name of the Seller or its nominee for the benefit of the Buyer.[7]

\*        \*        \*        \*        \*        \*        \*

9. Seller [Cattle Co.] agrees that, commencing with the fiscal year (January 1 to December 31) starting on the first January 1 to follow the execution of this Agreement, if for any reason whatsoever, the Basic Herd shall have less than an 80% annual live calf birth rate and if such deficiency shall not have been offset by calves born from the date of entry into a Program in excess of the 80% minimum for that year, then Seller shall promptly transfer to Buyer and add to Buyer's Herd a sufficient number of animals of a quality comparable to the progeny of other Basic Herds managed by Seller to the extent necessary to make up such net deficiency. The animals so transferred to make up any deficiency shall be approximately 50% heifer calves and 50% bull calves.

10. Seller agrees to forthwith replace any animal in the Basic Herd which shall, prior to its tenth (10th) birthday, die or be lost by theft or disappearance. The aforesaid obligation to substitute animals shall apply not only to the animals in the Basic Herd but also to any animal substituted therefor in accordance herewith. All substitutions shall be of comparable quality to the animal for which they are substituted.

11. In the event Buyer desires to remove his or its Herd from Seller's care and management, Buyer agrees to release Seller of all obligations under the Sales Agreement and Management Agreement. Seller agrees to release the Herd on the terms set forth below. Seller agrees that upon written notice from the Buyer to remove his or its Herd from Seller's management together with full payment of the Purchase Price (Note and accrued interest, where applicable), payment of 50% of the Progeny or Herd value determined as set forth below and payment of Management Agreement fees prorated to the date of Herd removal, Seller shall arrange, within 30 days, for the Herd to be

---

[7]The American Angus Association issues registration certificates for purebred Angus cattle and records such certificates in the American Aberdeen-Angus Herd Book. These certificates contain information on the registered cow, including its name and registration number, the name of its record owner, and provisions for subsequent transfer of its registration on the records of the American Angus Association. The registration certificates for the purebred cattle designated as part of petitioners' basic herds all indicate Cattle Co. as the record owner. All of the registration certificates for the purebred progeny of the basic herds list Cattle Co. as the first owner and do not reflect any subsequent owners. None of the certificates indicate that Cattle Co. held title in a fiduciary or other capacity for the benefit of petitioners.

prepared for shipment and delivery. If the Program is terminated within 30 days of the date of entry therein, no management fees will be paid by the Herd Owner. Buyer will pay all costs of preparation and shipment. If Buyer exercises his or its right under this Section, Seller agrees to reduce the Purchase Price and/or the outstanding principal balance of the Note, if applicable, in the following manner:

(a) If Buyer takes delivery of the Herd in 1977, such reduction shall equal Twenty Thousand Dollars ($20,000.00).

(b) If Buyer takes delivery of the Herd in 1978, such reduction shall equal Fifteen Thousand Dollars ($15,000.00).

(c) If Buyer takes delivery of the Herd in 1979, such reduction shall equal Seven Thousand Five Hundred Dollars ($7,500.00).

In the event Buyer terminates this Agreement during the first three calendar years of a Program, he will be required to pay the Company [Cattle Co.] 50% of the Progeny value as additional management fees. Thereafter, the Buyer will be required to pay the Company 50% of the Herd value as additional management fees. Both values will be determined by an independent third party selected by the Company. In the event that both this and the Management Agreement are terminated within 30 days of their execution, all sums paid by the Herd Owner will be refunded.

The Company will defend one test case at its own expense if its cattle breeding programs are challenged by the IRS. If such case is lost and if a Herd Owner thus loses his tax benefits the Company will, if the Herd Owner so elects, buy the Herd from the Herd Owner. That is, the Company will refund any principal or interest payments, or management fees (all of which shall be net of tax savings from which the Herd Owner has benefited, based on the assumption he is in a 50% tax bracket). In exchange therefor the Herd Owner will transfer his entire Herd to the Company, and the Sales Agreement, Management Agreement and Note will be mutually terminated. If the Herd Owner elects to thus resell his Herd he may recapture certain depreciation and investment credit deductions. (See "Recapture" above). The ability of the Company to buy back the Herd will be dependent on its financial viability. (See "Risk Factors–1. Financial Condition of the Company.")[8]

Finally, each sales agreement provides that it, the management agreement, the security agreement, and the promissory note constitute the entire understanding between petitioners and Cattle Co. and cannot be amended or terminated, orally, and shall be interpreted under the law of Iowa.

The promissory notes executed by petitioners call for the payment to Cattle Co. of $58,000 by Grodt & McKay and $28,500 by Davis Equipment, together with interest at the rate

---

[8]These last two paragraphs were taken directly from the memorandum. Whether the references to portions of the memorandum incorporate them in the sales agreements is not an issue in this case.

of 7 percent per annum. The promissory note executed by Davis Equipment provided for the payment of principal and interest as follows:

WITH RESPECT TO PRINCIPAL * * *

An amount equal to seventy-five percent (75%) of the total net proceeds (gross sales less commissions, sales costs and brokerage fees), resulting from the sale or other income derived from the animals in the Maker's Herd (as such term is defined in the certain Sales Agreement and Management Agreement between the Maker and the Company) in accordance with the Sales Agreement and Management Agreement will be applied first towards the payment of interest and then toward the reduction of principal until the principal balance of this Note has been paid in full.

The Maker has no personal liability of any kind whatsoever for the principal amount referred to above and in the event of default in payment of the amount, the Company will look only to the collateral (as that term is defined in the Security Agreement) and the Maker will have no personal liability for any deficiency.[9]

WITH RESPECT TO INTEREST:

The Maker will pay a total of $3,990 in 24 equal monthly interest payments commencing one year from the date of this Promissory Note. All other interest will be paid to the Company from the remainder, after payment of management fees in accordance with the Management Agreement, of the Maker's share of the proceeds realized from the sale or other income derived from the animals in the Maker's Herd. In the event such proceeds shall be insufficient to pay such accumulated interest, any deficiency will be carried forward and charged against the remainder of the Maker's share of the proceeds realized from future sales. Interest will be paid by the Maker in an amount sufficient to cover the estimated interest payable as of the end of the calendar year in which cattle income is realized. [Fn. ref. omitted.]

The Maker has no personal liability of any kind whatsoever for the interest payments referred to above and in the event of a default in the payment of such interest the Company will look only to the collateral (as that term is defined in the Security Agreement) and the Maker has no personal liability for any deficiency in interest payments.[10]

WITH RESPECT TO PRINCIPAL AND INTEREST:

Any unpaid balance of principal and interest will be due twenty (20) years from the date hereof.

---

[9]The memorandum specifically states that the notes will be recourse and the herd owner will be personally liable for the entire unpaid balance thereof upon maturity. It may be that the notes were made nonrecourse for petitioners because they were corporations, and, during 1976, corporations such as petitioners were not subject to the at-risk provisions of sec. 465. Testimony in this case also indicates that, in 1978, Davis Equipment and Cattle Co. amended Davis Equipment's note to conform with changes made to sec. 465.

[10]See note 9 *supra*.

Grodt & McKay executed an identical promissory note for $58,000 except for the first sentence of the first paragraph under the "With Respect to Interest" section, which provided:

The Maker will pay $2,030.00 commencing six months after January 1 of the year following the date of this Promissory Note; and every six months thereafter until four interest payments of like amount have been received by holder of the note.

The security agreements provide for assignments from petitioners to Cattle Co. of their interests in their herds to secure petitioners' payment and performance of all obligations to Cattle Co. required under the sales agreements, the promissory notes, and the management agreements.

The final agreements rounding out Cattle Co.'s planned cattle-breeding program were management agreements. In these agreements, Cattle Co. agreed to "breed, care for, manage, feed, transport and provide whatever is necessary, including, without limitation, medical services and facilities to the" herds. Cattle Co. also agreed to cull the herds periodically, and to sell most breeding cows by their 10th birthday. The management agreement also provided the following guaranty regarding the live-calf birth rate of cows in Cattle Co.'s charge:

5. The Company agrees that, commencing with the fiscal year (January 1 to December 31) starting on the first January 1 to follow the signing of this Agreement, if for any reason whatsoever the Breeding Herd shall have less than an 80% annual live calf birth rate and if such deficiency shall not have been offset by calves born from the date of entry into a Program in excess of the 80% minimum for all previous fiscal years, then the Company shall promptly transfer to Owner and add to Owner's Herd a sufficient number of animals comparable to the progeny of other herds managed by the Company necessary to make up such net deficiency. The animals so transferred to make up any deficiency shall be approximately 50% heifer calves and 50% bull calves. Progeny in excess of 80% shall be retained by the Company.

6. Beginning with the 1977 calf crop (i.e. calves born during the fiscal year commencing January 1, 1977), the Company may retain from each fiscal year's calf crop sufficient heifer calves to be ultimately added as replacements to the Breeding Herd. The Breeding Herd will consist of not less than five animals at all times, except during liquidation.

The management agreements, like the sales agreements, recite that Cattle Co. will artificially inseminate the cows in the breeding herds at no additional cost to petitioners.

Petitioners agreed to pay Cattle Co. $3,000 per year per unit for its services during the first 3 years the management agreements are in effect. After that time, and until the interest and principal due under the promissory notes is paid, Cattle Co. is to receive as management fees an amount equal to "25 percent of all net proceeds (gross sales price less commissions, sales costs and brokerage fees) derived from" petitioners' herds. The remaining 75 percent of the net proceeds is to be applied against the outstanding interest and principal due on the notes. Once all interest and principal is paid, Cattle Co. is to receive as management fees 75 percent of all net proceeds from petitioners' herds, and petitioners will receive 25 percent of the net proceeds.

Under the management agreements, Cattle Co. has full control over all sales of animals for which full payment is received in less than 24 months. On sales extending credit for 24 months or more, Cattle Co. must obtain petitioners' consent, which consent cannot be unreasonably withheld. Cattle Co. has the obligation to transmit semiannual accounting reports to petitioners and semiannual reports providing the following information regarding each animal in petitioners' herds: ear tatoo and ear tag numbers, name, sex, date of birth, registration number, breeding, calving, and progeny information. Cattle Co. further agreed to keep extensive herd records at their offices which would be available to petitioners. These records were to include Black Angus registration certificates on all herd animals, sales and breeding information, and other records related to the cattle-breeding program.

Other pertinent provisions of the management agreements provided:

14. The Company agrees to forthwith replace any animal in the Breeding Herd which shall, prior to its tenth (10th) birthday, die or be lost by theft or disappearance. All substitutions shall be of comparable quality for the animal for which they are substituted.

15. Subject to the express provisions contained herein and as long as either this Agreement is in effect or the Note remains unpaid, the Company shall have full control of the matters set forth in Section 7 hereof [relating to the sale of animals and prices therefor, the retention of progeny, the incorporation of progeny in the breeding program, and the selling, culling or replacing of animals in the herd] and the location, maintenance, expansion, breeding and culling of the Herd which constitutes the collateral security for such Note. The Company will also retain the right to determine the most opportune time for sales from the Herd and the right to make such sales.

Upon any default by the Company pursuant to the provisions of Section 19 below [relating to federal bankruptcy and reorganization, assignment for the benefit of creditors, and voluntary receivership, liquidation or reorganization under state law] and the termination of this Agreement pursuant thereto, or upon payment of the Note in full, Owner shall have the right to enter into any management agreement with respect to the Herd which Owner, in his sole judgment or discretion, may decide.

16. Either the Company or the Owner shall have the option to cause the liquidation of the Herd by giving written notice to the other at any time after the unpaid principal balance due on the Note has been reduced to $13,125 or less; provided, however, that the Company shall have such option to cause the liquidation of the Herd at any time before the principal balance of the Note has been reduced to $13,125 provided that the net proceeds of such liquidation shall at least equal three times the then remaining principal balance due on the note.

17. This Agreement shall terminate when the liquidation of the Herd has been completed and all net proceeds therefrom have been distributed as provided herein; provided, however, that the Company shall have the option to sooner terminate this Agreement by giving written notice to Owner at any time after the Note has been paid in full or after failure to cure any default in the payment thereof within 30 days after written notice of such default. The Company also has the right to terminate this Agreement upon Owner's default in payment of the management fees provided for in Section 8 hereof.

18. In the event of termination by the Company, the Company will give the Owner notice of such termination and the Owner will then have 10 days to advise the Company of his or its desire that the Company not liquidate the Herd. The Owner must then, at his or its own expense and within 30 days of the date of the Company's notice, remove his or its Herd and pay the Company the percentage of the Herd value as determined in accordance with Section 11 of the Sales Agreement, together with any unpaid management fees and unpaid principal and interest due on the Note calculated to the date of payment or, in the event a Note is not executed, payment in full of the purchase price and interest to date.

19. In the event the Company shall file a voluntary petition in bankruptcy, whether federal or state, or petition for any form of reorganization under the Bankruptcy Act of the United States or of any state, or make an assignment for the benefit of creditors, or voluntarily submit to any procedure for receivership, liquidation or reorganization under state law, or be the subject of an involuntary petition of bankruptcy which is not discharged within 90 days after being filed, Owner shall have the option to (1) remove the Herd from the Company's care, possession and control, and all further obligations of Owner to the Company under this Management Agreement shall promptly terminate or (2) in full satisfaction of all of his remaining obligations to the Company, he may assign all of his right, title and interest in the cattle to the Company.[11]

---

[11]In addition to the agreements already described, both petitioners also executed

The memorandum also included an extensive explanation of expected tax consequences concluding, but not guaranteeing, that an investor qualified for an investment credit and depreciation on the herd using a basis of $30,000. In addition, the memorandum indicated that investors could deduct the management fees and interest expenses, and that the profits realized from the sale of cattle would be taxed as capital gains (subject to the recapture provisions of section 1245). The memorandum advised potential investors that substantial expenses in excess of income were expected in the early years of the investment and that they should be prepared to retain their herds for at least 10 to 15 years. The memorandum further notified petitioners that Cattle Co. might enter into sales transactions with its officers and principals. Finally, the memorandum, as well as several of the agreements, warned investors that the offerings were not registered and that Federal and State securities regulations prohibited the transfer of an investor's rights unless registered or unless an exemption was available.[12]

Cattle Co. was incorporated on December 30, 1976,[13] and has its principal place of business in Des Moines, Iowa. Alfred T. Zimmerman is a director, chairman of the board, vice president, and secretary-treasurer of Cattle Co. John R. Hunter is a director and president of Cattle Co.[14] As of December 30, 1976,

---

subscription agreements on Dec. 9, 1976, in which they acknowledged that they had either a net worth of at least $50,000 and taxable income subject to an income tax rate of at least 40 percent, or a net worth of at least $100,000.

[12]The memorandum indicated that the expected cost of each cow in each investor's herd was between $1,000 and $1,500, that the value of the warranties which went with the cows was $15,000, and that a portion of the balance represented profit to Cattle Co.

The memorandum also describes the purchase price to investors as including the "raising, breeding and maintaining the animals prior to sale, investigation and inspection of cattle in order to obtain quality animals, sales commissions, transportation and insurance for purchased animals, veterinarian fees, costs of this offering, financing expenses, overhead charges for supervisory and management staffs and recordation of registration fees of animals with the appropriate breeding associations."

[13]Cattle Co.'s incorporation on Dec. 30, 1976, directly conflicts with representations made in the memorandum and agreements implying that Cattle Co. was already in existence on Dec. 8, 1976—the date of the memorandum. In addition, both petitioners believed that Cattle Co. existed at the time they executed the documents described above.

[14]Both Grodt and Davis knew Zimmerman prior to their transactions with Cattle Co. Grodt has known Zimmerman for roughly 25 years and they are associates in Centurion Financial Management, an apparently unrelated business. Zimmerman had been an adviser to Davis on pension and profit-sharing plans. Grodt also knew Hunter personally and professionally prior to his investment with Cattle Co. There were, however, no familial or significant personal relationships between petitioners' principals and Cattle Co.'s principals.

Zimmerman and Hunter each owned 50 percent of the outstanding stock of Cattle Co.[15] Hunter transferred approximately 50 Angus and Maine Anjou *commercial* cattle to Cattle Co. as his capital contribution. Cattle Co.'s unaudited balance sheet dated December 30, 1976, lists the following:

BALANCE SHEET

*Assets*

| | |
|---|---|
| Cash | $2,000 |
| Cattle (approximate market value) | 50,000 |
| Total assets | 52,000 |

*Liabilities and equity*

| | | |
|---|---|---|
| Liabilities | | 0 |
| Capital stock— | *Shares outstanding* | *Amount* |
| Issued for cash | 10 | $1 |
| Issued for cattle | 190 | 19 |
| Additional paid-in capital | 51,980 | 52,000 |
| Total liabilities and equity | [16] | 52,000 |

Grodt & McKay's check for $2,000 and Davis Equipment's check for $1,500 as their downpayments on the units were dated December 30, 1976. Cattle Co. owned no *purebred* Angus cows on either December 9 or 11, 1976 (the dates petitioners executed the agreements), or December 30, 1976 (the date on petitioners' checks for the downpayments). Cattle Co. deposited petitioners' checks in its account on January 4, 1977.

On February 3, 1977, Cattle Co. purchased nine purebred Angus heifers and one bull for $5,600 (an average price of $560 per head). On February 9, 1977, Cattle Co. purchased four purebred Angus heifers for $1,820 (an average price of $455 per head). And on March 18, 1977, Cattle Co. purchased one heifer and one cow (both purebred) from Hunter for $1,235.

Cattle Co.'s records indicate that the nine cows purchased on February 3, 1977, were originally designated as part of the Grodt & McKay basic herd. At some later time, Cattle Co. changed this designation so that only six of the cows pur-

---

[15]The record contains no evidence concerning the stock ownership of Cattle Co. subsequent to the date of its incorporation.

[16]There is no explanation of how the contributed cattle was valued, whether the 50 head of cattle contributed by Hunter constituted the total number of cows contributed, or who paid the initial $2,000 to Cattle Co.

chased on February 3, 1977, were part of the Grodt & McKay basic herd. Cattle Co. then designated three of the cows purchased on February 9, 1977, as part of the Grodt & McKay basic herd. The 10th cow designated as part of the Grodt & McKay basic herd was born on April 9, 1977, and was not a registered purebred. Of the cattle eventually designated as the Grodt & McKay basic herd, only five were of breeding age when purchased by Cattle Co. in February 1977, four became of breeding age during 1977, and one became of breeding age in 1978.

In 1977, three female calves and one male calf were born to the Grodt & McKay basic herd, of which the three females were purebreds. In 1978, three female calves and five male calves were born to the Grodt & McKay basic herd, of which all of the females and one of the males were purebreds. In 1979, five male calves and one female calf were born to the Grodt & McKay basic herd, none of which were purebreds. In 1979, there were also two female calves born to the Grodt & McKay herd, exclusive of the basic herd, both of which were purebreds. In May or June 1980, one of the cows in the Grodt & McKay basic herd died, but it had not been replaced by the time of the trial in this case (October 1980). One of the cows in the Grodt & McKay basic herd has never borne a calf.

Cattle Co.'s records indicate that three of the cattle purchased on February 3, 1977, and originally designated as part of the Grodt & McKay basic herd were eventually designated as part of the Davis Equipment basic herd. One of the cattle purchased on February 9, 1977, and one of the cows purchased from Hunter on March 18, 1977, were designated as the remainder of the Davis Equipment basic herd. None of the cattle designated as the Davis Equipment basic herd were of breeding age when purchased by Cattle Co. in February and March 1977.

There were no calves born to the Davis Equipment basic herd in 1977. In 1978, three female calves were born to the Davis Equipment basic herd, two of which were purebreds.[17] In 1979, three female calves and one male calf were born to the Davis Equipment basic herd, two of which were purebreds.

---

[17] One of these purebred calves was transferred to the Grodt & McKay herd.

The cattle comprising petitioners' herds had an average value as of January 1, 1977, of less than $600 per head. The average sales price for purebred Black Angus cows between October 1, 1975, and September 30, 1976, was $537; between October 1, 1976, and September 30, 1977, it was $542; between October 1, 1977, and September 30, 1978, it was $703; and between October 1, 1978, and September 30, 1979, it was $1,096.

Petitioners made the following payments to Cattle Co. under the terms of the agreements:

| Payment | Grodt & McKay | Davis Equipment |
|---|---|---|
| Downpayment | $2,000 | $1,500 |
| Management fees | | |
| 1977 | 6,000 | 3,000 |
| 1978 | 6,000 | 3,000 |
| 1979 | 6,000 | 3,000 |
| Interest | | |
| 1977 | 4,060 | 1,995 |
| 1978 | 4,060 | 1,995 |
| Total | 28,120 | 14,490 |

Cattle Co. issued various reports (in the form of letters from Zimmerman to petitioners) purporting to comply with its obligations under the management agreements. These reports were inaccurate, inconsistent from one year to the next, and varied from the information found in Cattle Co.'s books and records. Neither petitioner sufficiently examined these reports to determine whether Cattle Co. was complying with its warranties. At the time of trial, petitioners' herds were no better than average *commercial* herds. Over the years Cattle Co. has sold some cattle from each petitioner's herd, but it did not submit records from these sales to petitioners as required by the agreements. The net profits from these sales have been used to reduce petitioners' indebtedness to Cattle Co.

When petitioners entered the agreements with Cattle Co., they were both fully aware that Cattle Co.'s cost of the cows to be placed in their herds would be significantly less than the $6,000-per-head price they were paying. Petitioners attributed the difference to Cattle Co.'s warranties and management services. Both petitioners were in financial positions to seek

investment opportunities, but they failed to establish that they had any reasonable purpose for entering into the cattle-breeding activities other than the tax benefits they anticipated.

Petitioners did not supervise their investments with Cattle Co. in a prudent business manner. Neither petitioner has requested that Cattle Co. make any transfers to its herd to meet the requirements of the various warranties, and there is no evidence that any such transfers (other than the transfer mentioned in note 17 *supra*) have been made. Grodt saw the herd record sheets, but he did not check to see whether any of the cows in the Grodt & McKay basic herd were nonbreeders. In addition, Grodt did not know that one of the cows in the Grodt & McKay basic herd was not a purebred and that one was not born until April 7, 1977. Davis, on the other hand, never physically inspected the Davis Equipment herd until the spring of 1978. Davis has never inspected the herd record sheets and has never seen complete records of the sales from the Davis Equipment herd.

During 1977 and 1978, Hunter managed petitioners' herds. In 1979 and 1980, Cattle Co. contracted with Dennis Ory on an annual basis to feed and care for all of the cattle in petitioners' herds. Ory does the recordkeeping, furnishes labor, selects cattle for Cattle Co., manages the breeding, and pays for all direct maintenance expense of the cattle such as feed and veterinarian costs. Ory was compensated for these services in the amount of $250 per head in 1979, and $260 per head in 1980. Cattle Co. paid for semen and the certificate attesting to the donor-bull's quality whenever cattle were artificially inseminated. Such semen costs, including certification, were between $100 and $150 per insemination. Cattle Co. also furnished some of the necessary summer pasture land.

On its 1976 Federal income tax return, Grodt & McKay claimed a $786.68 investment tax credit based on its purchase of the two units of cattle for $60,000. On its 1977 income tax return, Grodt & McKay took deductions for depreciation of $7,500, management fees of $6,000, and interest of $4,060, all attributable to its herd of cattle. Davis Equipment claimed a depreciation deduction of $357.14 on its 1976 tax return, based on its herd of cattle. On its 1977 tax return, Davis Equipment claimed deductions for depreciation of $4,286, management

fees of $3,000, interest of $1,995, and fees to the Angus Association of $20, all attributable to its herd of cattle.[18]

Respondent disallowed all of petitioners' investment tax credits and depreciation deductions on the primary basis that the benefits and burdens of ownership of the cattle had not been transferred to petitioners. Alternatively, respondent determined that petitioners were not entitled to the depreciation deductions because they had failed to establish that they used the cattle in a trade or business or in the production of income, or that the cattle-breeding activity was entered into for profit. As a second alternative, respondent limited petitioners' depreciation deductions to amounts calculated using a fair market value for the cattle of $800 per head.

Respondent disallowed petitioners' management fees deduction on the primary ground that petitioners did not establish that the fees were ordinary and necessary expenses incurred in business or for the production of income, or that they were incurred in connection with an activity entered into for profit. Alternatively, respondent determined that the management fees should be limited to a reasonable amount—$500 per head per year for Grodt & McKay's herd, and $250 per head per year for Davis Equipment's herd.

Respondent disallowed petitioners' interest expense deductions on the primary ground that it had not been shown that the assets purchased had a fair market value equal to or exceeding the face amount of the note. Alternatively, respondent disallowed the interest deductions on the ground that the note was not a bona fide indebtedness.

Finally, respondent disallowed Davis Equipment's $20 Angus Association fee because it was not an ordinary and necessary business expense.

Prior to trial, the parties distilled respondent's determinations and produced the agreed-upon issues listed at the beginning of this opinion. Resolution of these issues will resolve all of the above disallowances.

---

[18]In his notice of deficiency, respondent made adjustments in Davis Equipment's claimed investment tax credit. It is not clear, however, whether any part of the adjustments is attributable to an investment tax credit claimed on the cattle. To the extent that it is, our decision regarding Grodt & McKay's investment tax credit also applies to Davis Equipment.

OPINION

The first issue for decision is whether petitioners' transactions with Cattle Co. were bona fide arm's-length sales for Federal income tax purposes, or whether they lacked the commercial, legal, and economic substance of sales. Respondent contends that the transactions were shams devoid of commercial, legal, and economic substance. Petitioners, on the other hand, assert that the transactions were bona fide cattle sales and should be treated accordingly. We agree with respondent that the transactions do not have the economic substance of sales.

A taxpayer's use of a device to form an illusion of reality and thereby create or inflate tax benefits is not a novel problem. It is well settled that the economic substance of transactions, rather than their form, governs for tax purposes. *Gregory v. Helvering*, 293 U.S. 465 (1935). Recently, in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), the Supreme Court summarized the principles underlying this doctrine:

This Court, almost 50 years ago, observed that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916 (1930). In a number of cases, the Court has refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred. E.g., *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 989 (1948); *Helvering v. Clifford*, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940). In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded "the simple expedient of drawing up papers," *Commissioner of Internal Revenue v. Tower*, 327 U.S. 280, 291, 66 S.Ct. 532, 538, 90 L.Ed. 670 (1946), as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering v. Lazarus & Co.*, 308 U.S., at 255, 60 S.Ct., at 210. See also *Commissioner of Internal Revenue v. P. G. Lake, Inc.*, 356 U.S. 260, 266–267, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); *Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945). Nor is the parties' desire to achieve a particular tax result necessarily relevant. *Commissioner of Internal Revenue v. Duberstein*, 363 U.S. 278, 286, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). [435 U.S. at 573.]

However, under the circumstances in *Frank Lyon Co.*, the

Supreme Court found that the substance of the challenged transactions were as structured, noting that where—

there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. [435 U.S. at 583–584.]

Bearing these fundamental precepts in mind, we now must examine the transactions before us to determine whether they amount to sales of cattle.

The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. *Commissioner v. Brown*, 380 U.S. 563, 570–571 (1965). The key to deciding whether petitioners' transactions with Cattle Co. are sales is to determine whether the benefits and burdens of ownership have passed from Cattle Co. to petitioners. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. *Haggard v. Commissioner*, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956).[19] Some of the factors which have been considered by courts in making this determination are: (1) Whether legal title passes (*Commissioner v. Segall*, 114 F.2d 706, 709 (6th Cir. 1940), cert. denied 313 U.S. 562 (1941); *Oesterreich v. Commissioner*, 226 F.2d 798, 802 (9th Cir. 1955)); (2) how the parties treat the transaction (*Oesterreich v. Commissioner, supra* at 803); (3) whether an equity was acquired in the property (*Haggard v. Commissioner*, 241 F.2d 288, 289 (9th Cir. 1956); *Oesterreich v. Commissioner, supra* at 803; see *Mathews v. Commissioner*, 61 T.C. 12, 21–23 (1973), revd. 520 F.2d 323 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976)); (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments (*Wiseman v. Scruggs*, 281 F.2d 900, 902 (10th Cir. 1960)); (5) whether the right of possession is vested in the purchaser (*Wiseman v. Scruggs, supra* at 902; *Commissioner v.*

---

[19]See also *Midwest Metal Stamping Co. v. Commissioner*, T.C. Memo. 1965–279.

*Segall, supra* at 709); (6) which party pays the property taxes (*Harmston v. Commissioner*, 61 T.C. 216, 229 (1973), affd. 528 F.2d 55 (9th Cir. 1976)); (7) which party bears the risk of loss or damage to the property (*Harmston v. Commissioner, supra* at 230); and (8) which party receives the profits from the operation and sale of the property (*Harmston v. Commissioner, supra* at 230). See generally *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976). Using the above criteria as guideposts, we conclude that Cattle Co. did not sell the cattle to petitioners.

Unfortunately, the record in the present case is inadequate to determine whether petitioners or Cattle Co. held legal title to the cattle in petitioners' herds. The evidence does establish, however, that petitioners allowed Cattle Co. to represent itself as record owner of the cattle in their herds with the American Angus Association, even though the sales agreements call for the registration of the cows in the name of Cattle Co. *for the benefit of petitioners.* In fairness, it should be noted that the herd record sheets maintained by Cattle Co. do list petitioners as the owners of the cattle in their herds. The record does not disclose, however, whether the registration certificates are readily available to the public or relied on in the industry as a means of ascertaining legal ownership. Under the terms of the agreements, petitioners had the right to inspect Cattle Co.'s records and the registration certificates (which were kept as a part of Cattle Co.'s records). Although Grodt inspected the records on behalf of Grodt & McKay, he apparently made no demand on Cattle Co. to correct the registration certificates to show that Cattle Co. held title for the benefit of Grodt & McKay. Davis, on the other hand, did not even bother to inspect the records for Davis Equipment. We find that petitioners treated Cattle Co. as the record owner and consented to its representation of that status to third parties.

Petitioners did not acquire an equity in the cattle either at the time they purportedly purchased the cattle, or subsequently when Cattle Co. actually acquired the cattle finally designated as part of petitioners' basic herds. Petitioners ostensibly paid $6,000 per head for cows they knew were worth far less and which we find had a fair market value not in excess of $600 per head. Petitioners explained that they were purchasing far more than just the cows. They contend that they were

also purchasing warranties and guaranties which went along with the cows, the expertise and assistance of Cattle Co. in their cattle-breeding endeavors, and the various management services rendered by Cattle Co. Petitioners introduced extensive evidence from purported experts to urge the conclusion that the fair market value of each cow in light of these additional considerations was approximately equal to the ostensible purchase price of $6,000 per head. We found this evidence and petitioners' explanation unsatisfactory.

Petitioners maintain that in determining a fair market value for the cattle we cannot look at the various agreements in isolation, but rather must view them in toto as constituting the entire purchase. We agree with petitioners that any analysis of the transactions in this case must consider all of the agreements together. When we do so, petitioners' cause is hardly advanced.

Based on the actual prices paid by Cattle Co. for the cows in petitioners' herds, and on the average sales prices of similar cows during the period when Cattle Co. made these purchases, we have found that the fair market value of the cattle was $600 per head. In addition, since the standard practice in the industry when selling breeding cattle is to include a nonbreeder warranty, that warranty adds nothing to the established fair market value of petitioners' cattle. In the same fashion, the warranty that the cows are purebreds does not add any value to the cattle since the average prices relied upon were also for purebred cattle.

To the extent petitioners contend that the fair market value of the cattle should include the costs of management services, artificial insemination, and insurance against all risks of death or other loss of the cows, we cannot agree. These expenses are the period expenses of maintaining, using, and protecting the cattle. Under the circumstances of this case, there is no reason to include the cost of these items as a component of the cost of the cattle.[20]

---

[20]Assuming the transactions should be treated as structured by petitioners, these types of costs are more properly characterized as management expenses which were more than amply paid for under the management agreements. Moreover, if petitioners did view the $6,000 price per cow as including these costs, it was incumbent on petitioners to establish what portion of the price is so allocable to these items. Petitioners made no attempt to make an allocation.

There remains for consideration only the 80-percent live calf birth rate warranty.[21] We need not here decide whether a warranty of this type is a proper component of cost, since this warranty, plus the initial $600 fair market value for each cow, does not begin to equal $6,000.

On the evidence introduced in this case, it is very difficult to determine whether the 80-percent live calf birth rate warranty had any substantial value. Respondent introduced evidence tending to establish that an 80-percent live calf birth rate is the industry average, whereas petitioners introduced evidence that the average is only 70 percent. Rather than rely on questionable evidence from both sides to determine what the industry average actually is, we will assume the industry average is 70 percent. Petitioners bear the burden of proving that, based on an industry average of 70 percent, the value per cow of the 80-percent live calf birth rate is equal to $5,400 ($6,000 less $600). Petitioners made numerous calculations attempting to establish this, but these calculations were not persuasive.[22] We therefore hold that this warranty had only minimal value.

Petitioners have failed to establish that the fair market value of the cattle was at least approximately equal to the purchase price. Since a normal attribute of a true arm's-length sale is a purchase price at least approximately equal to fair

[21]Our analysis here will not focus on the fact that Cattle Co. failed to live up to most of its warranties and promises. Rather, we find that at the time petitioners executed the agreements, they reasonably expected Cattle Co. to meet its obligations.

[22]The agreements, themselves, provide Cattle Co. with a convenient method of greatly reducing, if not entirely eliminating, any risks it has under the 80-percent live calf birth rate warranty. The warranty covers all cows in the breeding herds. A heifer born into the herds is not considered a part of the breeding herds until she reaches the age of 24 months. However, an Angus heifer reaches breeding age between 18 and 20 months. Thus, Cattle Co. has between 4 and 6 months to attempt to breed the heifer before that heifer is covered by the warranty. If it is apparent to Cattle Co. that the heifer will not breed, or has a low tendency to breed, Cattle Co. can cull the heifer from the herd before it joins the breeding herds and thus reduce its present and future obligations under the warranty.

Cattle Co. has the unfettered discretion to cull the herds periodically. If a cow which is part of the breeding herds fails to become impregnated, there is only one limitation on Cattle Co.'s ability to cull that cow from the breeding herds, namely, that each breeding herd never consist of fewer than five animals. Thus, Cattle Co.'s promise, albeit on the surface a somewhat valuable warranty, is worth little. Even if Cattle Co.'s ability to cull cows from the herds is subject to an implied reasonableness standard, it is difficult to imagine how the culling of a nonbreeder from breeding herds of cattle is anything but reasonable.

market value, the totally disproportionate purchase price in this instance strongly militates against petitioners' contention that a true sale has taken place. *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. on different grounds 64 T.C. 752 (1976).[23]

Additionally, the agreements are clear that petitioners have no right to possess the cattle or to exercise any real control or dominion over them. Cattle Co. has complete control over the sale of animals, the sales price,[24] retention of progeny, the incorporation of progeny into the breeding herds, the culling and replacing of herd animals, and the location, maintenance, expansion, and breeding (including artificial insemination) of the herds. Petitioners' only rights with respect to the possession, control, or dominion of the herds are extremely limited and, as a practical matter, valueless.

Petitioners have the right to terminate the management agreements on 30 days' notice, to cause the liquidation of the herds when the note balances are $13,125 or less, and, under certain circumstances,[25] to remove their herds from Cattle Co.'s "care, possession and control"[26] or to assign all their interests in the cattle back to Cattle Co. To acquire actual possession of the cattle, however, petitioners must fully pay off their notes and they must release Cattle Co. from all obligations under the agreements. Petitioners must also pay additional management fees equal to one-half the value of their progeny or the herds. If, however, petitioners exercise the right to take possession of their cattle during 1977, 1978, or 1979, the purchase price is reduced $20,000, $15,000, or $7,500 per unit, respectively.

These provisions, while ostensibly giving petitioners rights to the possession, control, and dominion over their cattle, are mere facades without any substance. For example, during 1977 each petitioner could obtain possession of each unit of

---

[23]In *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), on appeal (9th Cir., Jan. 15, 1981), we adopted the analysis of *Estate of Franklin v. Commissioner*, 544 F.2d 1045, affg. on different grounds 64 T.C. 752 (1975).

[24]The one exception to this is that Cattle Co. must obtain petitioners' consents for any sales for which it is extending credit for 24 months or more. Petitioners' consents, however, may not be unreasonably withheld.

[25]E.g., Cattle Co.'s liquidation, bankruptcy, receivership, etc.

[26]These words are taken directly from par. 19 of the management agreements.

cattle by paying $10,000, less the downpayment, and by agreeing to release Cattle Co. from all of its obligations. Assuming the cattle did not have any progeny at the time petitioners exercised this right, they would be paying a total of $10,000 for cattle with a maximum fair market value of $3,000 ($600 for each of five cows). A purported right to possession, control, and dominion, when burdened by a cumbersome cost which no reasonable person would pay is a hollow right indeed.[27] A true sale for tax purposes must provide the purchaser with more.

Continuing our analysis, we find that under the terms of the agreements, Cattle Co. assumed all of these risks with respect to the cattle in petitioners' herds. Petitioners' risks in this regard are only that Cattle Co. might not make good on its promises to assume these risks. This is not the risk normally associated with ownership for tax purposes.

Finally, we must examine the allocation of the profits from sales. Here, Cattle Co. and petitioners have used labels to create the appearance that petitioners are receiving a benefit from the net profits from sales of cattle. In fact, until the amount of net proceeds from each petitioner's herd is equal to 133 percent[28] of the amount of each petitioner's promissory note plus interest, 100 percent of the profits go to Cattle Co. These funds are labeled as management fees and principal and interest payments on the promissory notes. The labels, however, are not controlling. Only after the principal amount of the note is retired will petitioners ever receive any cash, and even then they will be entitled to only 25 percent of the net proceeds. This is merely a not very realistic chance to acquire a profits interest in the future if the value of the herds greatly increases. We conclude that this allocation of speculative

---

[27]This situation continues at least until the value of petitioners' herds are equal to twice the outstanding balances on their notes—a point in time almost entirely controlled by Cattle Co. because it has full control over sales and sales prices. Once this point is reached, it is to the advantage of Cattle Co.'s principals to liquidate the herd by having Cattle Co. sell it to themselves. Since this will produce no possessory interest in petitioners, it is highly unlikely that the notes will be paid off prior to a decision by Cattle Co. to liquidate the herds.

[28]Since the net proceeds from sales will be allocated one-quarter to management fees and three-quarters to principal, plus interest, sales must produce 133 percent of the total principal, plus interest, to retire the note.

future profits is inadequate to support a sale for Federal tax purposes.

In short, when the various agreements are probed beneath their labels and are considered in the context of the surrounding facts and circumstances, it strains credulity and offends logic to find that a true sale, to be recognized for tax purposes, had taken place. We must conclude the contrary.

The next question for decision is how should the transactions be treated for Federal income tax purposes. Respondent maintains that since the transactions are not sales it follows, ipso facto, that the transactions are shams having no economic, legal, or commercial effect and should be disregarded for Federal tax purposes.[29] While we disagree with respondent's premise that any transaction which purports to be a sale, but which is not, is necessarily a sham (see *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. on different grounds 544 F. 2d 1045 (9th Cir. 1976) (purported sales were not sales but options)),[30] we do find that under the circumstances of this case the transactions between petitioners and Cattle Co. should be entirely disregarded for tax purposes.

The courts have, in appropriate circumstances, disregarded for Federal tax purposes transactions entered into without any economic, commercial, or legal purpose other than the hoped-for favorable tax consequences flowing therefrom. *Knetsch v. United States*, 364 U.S. 361 (1960); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Estate of Franklin v. Commissioner, supra*; *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), cert. denied 385 U.S. 1005 (1967); *Diggs v. Commissioner*, 281 F.2d 326 (2d Cir. 1960), cert. denied 364 U.S. 908 (1960); *Derr v. Commissioner*, 77 T.C. 707 (1981); *Hager v. Commissioner*, 76 T.C. 759 (1981); *Narver v. Commissioner*, 75 T.C. 53 (1980), on appeal (9th Cir., Jan. 15, 1981); *Beck v. Commissioner*, 74 T.C.

---

[29]Some support for this result can be found in the language of *Narver v. Commissioner, supra*, and the Ninth Circuit's opinion in *Estate of Franklin v. Commissioner, supra*. See *Hager v. Commissioner*, 76 T.C. 759, 775 n. 8 (1981).

[30]See also 1 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 4.4, at 4–56 (1981).

1534 (1980); *Millbrew v. Commissioner*, T.C. Memo. 1981–610.[31] While we do not here propose to draw precise lines of demarcation between valid and invalid tax shelters, the facts of this case are so far over the line that it is appropriate to disregard the transactions for tax purposes.

Analysis of the transactions involved reveals only attempted tax benefits, not any realistic possibility of economic reward. The agreements make clear that none of the profits from the cattle-breeding activities will actually flow to petitioners until such time as the principal amounts of the notes are paid in full. Prior to this time, if the transactions are treated as structured and given the tax consequences explained in the memorandum and anticipated by petitioners, the only benefits petitioners can expect from the transactions are tax benefits. Petitioners hoped to be entitled to investment tax credits and depreciation deductions based on a cost of $30,000 per unit. They also hoped to deduct the amounts designated as management fees and interest which were paid during the first 3 years to Cattle Co. During the time prior to complete payment of the note, they hoped that the net proceeds from sales of cattle would be taxed as capital gains.

This tax treatment is not basically different from the tax benefits which might be available under valid tax shelter arrangements (e.g., depreciable real estate). Favorable tax consequences alone are no reason to ignore transactions for tax purposes. However, where there is no substance to the transactions aside from the hoped-for tax consequences, a different question is presented.

Grodt and Davis gave extensive testimony regarding their alleged profit motives for executing the agreements. They contend they sought the profits which might arise from a successful cattle-breeding activity, and they relied entirely on Cattle Company and its officers to carry on the venture. Petitioners also testified that they anticipated that the notes would be paid in full. Despite the testimony of Grodt and Davis, we do not believe petitioners ever expected any economic gain from the cattle-breeding activities.

---

[31]These cases represent merely a sampling of the enormous number of cases in which courts have concluded that the facts do not support the tax consequences requested by taxpayers.

While investors may leave the conduct of business to others, the behavior of Grodt and Davis in this instance is indicative of the lack of business substance to this transaction. Both Grodt and Davis were experienced businessmen. Yet, neither ever carefully reviewed any of Cattle Co.'s books and records or the "reports" sent to them by Cattle Co. Neither sought to have Cattle Co. meet its obligations under the agreements. In sum, petitioners appeared completely indifferent to the success or failure of the venture.

Petitioners have also not convinced us that the notes will ever be fully retired. On brief, petitioners made elaborate calculations of increases in the value of their herds. These calculations, however, were unpersuasive. Moreover, under the terms of the agreements, themselves, there is little realistic hope that the notes will ever be fully paid prior to a decision by Cattle Co. to liquidate the herd. Any liquidation of the herd prior to the time the values of the herds are equal to twice the outstanding balance of the notes will give 100 percent of the proceeds to Cattle Co. After that, Cattle Co. will have to share any proceeds with petitioners until theoretically petitioners reach a maximum share of 25 percent. However, the memorandum specifically warned petitioners that Cattle Co. might enter into sales transactions with its officers (Zimmerman and Hunter). Thus, if the cattle-breeding activity were successful, Cattle Co. could liquidate the herds by selling them to Zimmerman and Hunter when the value of the cattle exceeded twice the outstanding balance of the notes.[32] If, as should be expected, the liquidations take the shape of a sale to Cattle Co.'s principals, they will effectively eliminate any prospect for profit to petitioners and maximize the profits to Cattle Co. and its principals. In light of this very real probability, petitioners, who were experienced businessmen, could not have harbored any serious expectation of profit.

In summary, we hold that, under the factual circumstances of this case, where petitioners have gone to great lengths to clothe in "sales" garb transactions which are not sales, and

---

[32]While Cattle Co. is somewhat restricted in its power to liquidate before the notes are reduced to $13,125, the company's power to control the culling of the herd and sale of the cattle does not present it with any inseparable obstacle to the shift of any gains to itself and its owners and away from its purported investor.

where petitioners' only real expectations of profit rest on the hoped-for tax benefits, the transactions do not have sufficient substance apart from tax manipulation to be recognized for tax purposes.

*Decisions will be entered under Rule 155.*