ROBERT L. WHEELER and HELENE E. WHEELER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MORTON S. ROSEN and BEVERLY ROSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
Wheeler v. Commissioner
Docket Nos. 4346-80, 4347-80.
United States Tax Court
T.C. Memo 1983-385; 1983 Tax Ct. Memo LEXIS 403; 46 T.C.M. (CCH) 642; T.C.M. (RIA) 83385; June 30, 1983. *403 Milton A. Levenfeld and Alan F. Segal, for the petitioners. Stephen J. Morrow and Allan E. Lang, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Docket No.
Year
Deficiency [1]
4346-80 (Robert L.
1975
$15,240
and Helene E.
1976
22,580
Wheeler)
1977
13,814
4347-80 (Morton
1975
46,424
S. and Beverly
1976
42,537
Rosen)
1977
24,532
These cases are consolidated for trial, briefing, and opinion. The issue is whether petitioners are entitled to various deductions and credits claimed in connection with their investments in a cattle breeding operation. FINDINGS OF FACT Some of the facts are stipulated and found accordingly. All petitioners herein resided in Illinois when they filed their petitions. Petitioners Morton S. Rosen *404 and Robert L. Wheeler are dental partners practicing in Illinois. In 1973, petitioner Morton S. Rosen entered a commercial cattle breeding tax shelter promoted by Ralph A. Eckhardt (Eckhardt), an Iowa cattle operator and a dental patient of Rosen. In 1975, Rosen's partner, petitioner Robert L. Wheeler, entered the same tax shelter. Pursuant to this tax shelter, petitioners were to purchase a herd of cattle from American Land and Cattle Industries, Inc., (ALC), a corporation wholly owned and operated by Eckhardt. The herd was to be maintained for the production of cattle to be sold for feeding and slaughter. ALC hoped to retain superior female progeny to upgrade the quality of the herds while inferior female animals and steer calves would be sold for slaughter, a process referred to as "culling." ALC represented that unregistered cattle would be bred with purebred bulls. Breedable heifers would be added back to the basic herd to replace those that had been culled. In this manner, petitioners would have a constantly evolving herd. Petitioners allegedly purchased the following herds for the following stated purchase prices: Size of
Stated Purchase
Year
Herd (Brand)
Price
Petitioner
1973
70 (Hereford)
$70,000
Morton S.
1974
30 (Angus)
60,000
Rosen
1975
30 (White Faced
60,000
Angus)
1976
50 (Charolais)
100,000
Petitioner
1975
30 (Angus)
60,000
Robert L.
1976
30 (Hereford)
60,000
Wheeler
*405 Each herd was purchased with a small cash downpayment and a large nonrecourse note to ALC. In addition, a portion of the stated purchase price of each herd consisted of either a "bank loan" or an "ALC advance." The manner in which the herds were financed is illustrated by the following chart. Purchase
Nonrecourse
"Bank"
"ALC"
Herd
Price
Cash
Note
Loan
Advance
Petitioner
1973
$70,000
$7,700
$45,500
0
$16,800
Morton S.
1974
60,000
3,900
39,000
$16,800
300
Rosen
1975
60,000
3,000
39,000
18,000
0
1976
100,000
0
70,000
0
30,000
Petitioner
1975
60,000
3,000
39,000
18,000
0
Robert L.
1976
60,000
0
42,000
0
18,000
Wheeler
Each "bank loan" was made with the Decatur County State Bank of Leon, Iowa. No loan applications, financial statements, or net worth statements were submitted by either Eckhardt, Rosen, Wheeler, or any other person in connection with these loans, and no inspections of any cattle or land owned by either Eckhardt or petitioners was conducted by the bank in connection with these loans. Proceeds of these loans never left the bank; they were used to purchase certificates *406 of deposit which were retained by the bank as collateral for the loans. No part of the "ALC advances" which constitute a portion of the stated purchase price of several of petitioners' herds has been repaid by petitioners. Under the purchase agreements, ALC guaranteed to replace, at no cost to petitioners, any purchased breeding animal that died or was lost (from whatever cause). After two years, ALC guaranteed that cash from the sale of cattle would be equal to or greater than the annual payment due ALC on the nonrecourse note plus the maintenance fee. In addition, ALC guaranteed to purchase back petitioners' herds at their "Net Herd Value" whenever petitioners chose to terminate the agreement. After seven years, the "Net Herd Value" was guaranteed to be at least whatever portion of the purchase price exceeded the nonrecourse note. Thus, for instance, the "Net Herd Value" of Wheeler's 1975 herd was guaranteed at $21,000 as of December 31, 1981. ALC was to provide the requisite management service to care, feed, breed, and otherwise maintain and sell the cattle. In return, petitioners were required to pay an annual $98 maintenance fee per head for the 1973, 1974, and 1975 *407 herds. The fee was $147 per head for the 1976 herd. In connection with this venture, petitioners claimed various farm expense deductions and investment tax credits. In his notices of deficiency, respondent disallowed all deductions to the extent they exceeded any reported income and all credits arising out of this cattle shelter for petitioners' taxable years 1975 and 1976. [2]
OPINION Respondent attacks the shelter on several grounds. He claims that the cattle, which were purported to be the sole assets of the venture, never existed; thus, he claims the entire venture was a sham and should be disregarded completely. Alternatively, he claims that, even if the cattle existed, the purchases did not constitute sales for tax purposes and/or that petitioners did not enter the venture with a profit motive. We agree with respondent. On August 31, 1982, respondent, accompanied by petitioner's counsel, made an inspection of petitioner's cattle. The location of the inspection was on land owned by Eckhardt in Iowa. The cattle inspected were represented *408 to be the cattle owned by petitioners and pictures of the inspected cattle were taken. Prior to this inspection, on August 1, 1982, Eckhardt contacted Gordon Reisinger, a cattle broker for the Clifton Cattle Company, to acquire a load of cattle. Pursuant to a sales agreement, Reisinger delivered 170 cattle to Eckhardt just prior to the inspection. Subsequent to the inspection, Reisinger repossessed the cattle on October 1, 1982, upon Eckhardt's default of the sales agreement. Reisinger identified the cattle in the pictures taken at the August 31 inspection as the same cattle he sold to Eckhardt. We must agree with respondent that the cattle inspected on August 31, 1982, were nothing more than a "rent-a-herd" staged to lead respondent into believing they were owned by petitioners. It goes without saying that if petitioners did not own any cattle, none of the claimed deductions and credits are allowable. Respondent has shown to our satisfaction that no such herds, whether through the evolutionary product of the "culling process" or otherwise, existed either at the time of the inspection or at any time prior to the inspection. Therefore, we sustain respondent's determination. *409 Petitioners' counsel admit the cattle that were inspected were not petitioners' cattle although at the time of the inspection, they, too, assumed the cattle inspected were petitioners'. [3] Nevertheless, they infer, there could have been other cattle. Other than the "rent-a-herd", however, no evidence of any cattle identified as petitioners was presented to the Court. Moreover, no explanation for the "rent-a-herd" was given. If there were other cattle, we fail to see what purpose the "rent-a-herd" served. Furthermore, petitioners had no knowledge about the operation of this breeding program and they never visited or personally inspected any cattle; they relied totally on Eckhardt. We further hold for respondent on alternative grounds. The tax avoidance considerations so overwhelmingly pervade this tax shelter in comparison to any true economic objectives that, under the particular facts of this case, even if the cattle did exist, petitioners lacked the requisite profit motive to be allowed the disputed deductions. See recent *410 decisions of this Court, Fox v. Commissioner,80 T.C. 972 (1983); Flowers v. Commissioner,80 T.C. 914 (1983); Brannen v. Commissioner,78 T.C. 471 (1982). Petitioners are individual passive investors who essentially knew nothing about cattle. They were content to make small cash payments and report huge tax write-offs through highly inflated purchase prices by using nonrecourse liability and other financing techniques. [4] For instance, with respect to Wheeler, he has allegedly acquired an asset with a stipulated fair market value of $30,000 for a stated purchase price of $120,000. [5] Of this price, $81,000 is nonrecourse indebtedness while another $36,000 is represented by a "bank loan" and an "ALC advance." Through its promise to buy back at the "Net Herd Value," ALC guaranteed petitioners against any loss on both the "bank loans" and the "ALC advances." Moreover, sufficient operating income was guaranteed to cover all maintenance fees and purchase payments commencing the third year, the same year petitioners were obligated to begin making payments on the herds. [6] The obvious purpose of this arrangement was simply to shelter *411 large incomes from petitioners' dental practices, all at the expense of the Federal government. See also Houchins v. Commissioner,79 T.C. 570 (1982) and Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981), where this Court reached the same result with respect to other cattle breeding shelters since the taxpayers acquired no "ownership interest" in the cattle. Both of these cases likewise were marked by highly inflated purchase prices and nonrecourse liability which generated great tax benefits without any realistic objective of economic benefit. *412 Petitioners contend the burden of proof has shifted to respondent since he has raised an issue different from the issue asserted in the notice of deficiency. [7] Our decision is the same regardless of who has the burden of proof. Respondent has proved to our satisfaction that none of the claimed deductions and credits herein are allowable. The trial of this case was held November 18 and 19, 1982. On December 27, 1982, respondent filed a Motion to Reopen the Record in order to introduce newly discovered evidence that the cattle inspected were purchased by Eckhardt only days before the inspection. This Court granted respondent's motion and ordered the record be reopened for the sole purpose of receiving newly discovered evidence with respect to the ownership issue. There is no express provision in either the Tax Court Rules of Practice and Procedure or the Federal Rules of Civil Procedure directing itself to the authority of a court to reopen the record *413 for the purpose of receiving additional evidence. Such authority, however, is inherent in the judicial administration of the law and a court's fact finding function. It is also implicit in Rules 59 and 60, Federal Rules of Civil Procedure, which authorize new trials and certain relief from judgments or orders. [8] A motion to reopen for additional proof is within the discretion of the trial court, Zenith Radio Corp. v. Hazeltime Research Inc.401 U.S. 321 (1971); Thomas v. SS Santa Mercedes,572 F.2d 1331 (9th Cir. 1978), Nor-Cal Adjusters v. Commissioner,503 F.2d 359 (9th Cir. 1974), affg. a Memorandum Opinion of this Court, and such court will sooner grant a motion to reopen made after submission, but before its decision, than when the motion comes to it after decision has been rendered. Caracci v. Brother Internat'l Sewing Machine Corp. of La.,222 F. Supp. 769 (E.D. La. 1963), affd. per curiam 341 F.2d 377 (5th Cir. 1965). Respondent's motion to reopen this case was based on newly discovered evidence that the cattle inspected on August 31, 1982, were not, in fact, owned by petitioners. This *414 evidence was clearly material to the case and warranted reopening the record for this limited purpose. [9]
To reflect the foregoing and concessions, Decisions will be entered under Rule 155.
Footnotes
1. In his notice of deficiency, respondent originally determined deficiencies of $38,313 and $17,502 for 1976 and 1977 in docket No. 4347-80 (Morton S. and Beverly Rosen). By amended answer, respondent increased those deficiencies to reflect the above amounts.↩
2. With respect to petitioners Morton S. and Beverly Rosen, the statute of limitations bars assessment of 1973 and 1974 taxes.↩
3. This admission was made at the hearing to reopen the record for the purpose of receiving newly discovered evidence. See pgs. 10-11, infra.↩
4. For instance, proceeds of the "bank loans" never left the bank. They were simply used to purchase certificates of deposit which were retained by the bank as collateral for the loans. Moreover, contrary to the bank's policy in granting cattle loans, no applications, financial statements, or net worth statements were filed in connection with these loans, and the bank made no inspection of any cattle or land pursuant to the granting of these loans. These loans were not based on petitioners' credit, or, for that matter, anyone's credit. The bank was totally free of any risk for these loans. The loans were made solely because the proceeds of the loans themselves were put up as security. We fail to see any purpose served by these loans. ↩
5. The parties entered into this stipulation prior to the discovery of evidence regarding the "rent-a-herd." ↩
6. We are not influenced in that Rosen and Wheeler may not have been aware of the ALC guarantee. The guarantee is unambiguously and prominently set forth in the agreement.↩
7. In his notice of deficiency, respondent disallowed the claimed deductions and credits since petitioners lacked a profit motive.↩
8. Rule 1 of the Tax Court Rules of Practice and Procedure↩ provides, in part, that where there is no applicable rule of procedure, the Court or the Judge before whom the matter is pending may prescribe the procedure, giving particular weight to the Federal Rules of Civil Procedure. 9. In reaching our decision, we limited our consideration of the evidence presented at the reopening hearing to the affidavit of Gordon Reisinger.↩