In the Matter of L.G.J. RESTAURANT, INC., d/b/a Sticks N Stones, Debtor.

Bankruptcy No. 881–83549–17.

United States Bankruptcy Court,
E.D. New York.

9 Feb. 1983.

456

Salierno & Wein by John V. Salierno, Middle Village, N.Y., for debtor.

Robert Abrams, Atty. Gen., New York City by David S. Cook, Asst. Atty. Gen., New York City, of counsel, for State Tax Com'n.

## DECISION

BORIS RADOYEVICH, Bankruptcy Judge.

The debtor, LGJ Restaurant Corp., by notice of motion dated 29 September, 1982, objects to the allowance of claim # 6 in the amount of $232,291.97 filed by the New York State Tax Commission on 23 April, 1982. This claim was later amended on 9 November, 1982 to the sum of $200,068.69. On the motion's return date, 7 December, 1982, an affidavit in opposition was filed by Assistant Attorney General David S. Cook, and a hearing on the objection to claim was held. Based upon the evidence produced at said hearing the Court makes the following:

## FINDINGS OF FACT

1. LGJ Restaurant Corp. (hereinafter "LGJ"), located at 264–11 Union Turnpike, New Hyde Park, New York, is a corporation chartered in July of 1976 and exists under the laws of the State of New York for the purpose of operating a combination bar/restaurant. Transcript of 7 December, 1982 at 4 (hereinafter "Tr. at ").

2. On 4 November, 1981 LGJ filed its petition under Chapter 7 of Title 11 of the United States Code.

3. During the ordinary course of LGJ's operation, it kept books and records of all its receipts and disbursements, as well as tapes from its cash register. Said documents have at all times been available for examination. See Debtor's Exhibit 1. Tr. at 4, 5, 9–10, 17, & 19. Transcript of 8 December, 1982 at 3, 4 (hereinafter "Tr. II at ").

4. LGJ retained an accountant, who during its entire operating period, prepared and properly filed its quarterly sales tax returns with the State of New York. Said returns were prepared from information contained in LGJ's books and records. Tr. at 19.

5. In the period September 1976, through August, 1981 LGJ's tax returns indicate that it had sales of $2,800,930 and

an accompanying tax liability of $210,-860.40.[1] Debtor's Exhibit 1 & 2.

6. In May of 1979, LGJ was experiencing financial difficulties. As a result, it thereafter was only able to make partial payments on the sales tax returns filed through May of 1980 and no payments on the subsequent returns filed through August of 1981. Debtor's Exhibit 3. Tr. at 32–33.

7. LGJ's tax returns report that its outstanding sales tax liability, excluding interest and penalties, is $63,683.97. Debtor's Exhibit 2 & 3. Tr. at 47.

8. Pursuant to a random procedure, LGJ was selected by the N.Y.S. Tax Commission (hereinafter "the State") for audit in May of 1979. Tr. at 57, 99–100.

9. The State's tax auditor ignored and made no effort to examine LGJ's cash register tapes. Tr. at 59, 60, 64, 82, 85, 99 & 131–132.

10. Based upon LGJ's receipts and disbursements for the month of October 1979, the State's tax auditor calculated LGJ's reported alcoholic beverage and food sales to be 182.3% and 60% (respectively) greater than the cost of the involved inventory. Creditor's Exhibit A. Tr. at 60, 62, 64, 66, & 124.

11. Based upon his own presumption that the percentages adduced in finding of fact # 10 were insufficient, and without any proof that LGJ's books, records, accounts, or returns were false or inaccurate; the auditor decided to utilize a "mark-up test" to determine LGJ's taxable sales and resultant tax liability. Tr. at 61.

12. Based upon the beverage inventory invoiced for the month of September, 1979 and the food inventory invoiced for the month of May, 1980, the auditor determined the debtor's sales mark-up to be 320% for liquor, 277% for beer, and 173% for food. Creditor's Exhibit C. Tr. at 62, 63, 65–66, 73 & 78.

13. Utilizing the mark-ups referred to in finding of fact # 12, the auditor projected LGJ's estimated sales between August of 1976 and November of 1980 (18 tax quarters) to be $3,831,987 with an accompanying sales tax liability of $286,129. Subtracting the $211,262.30 in sales tax already paid by LGJ, and adding the sales tax, interest and penalties which consequently came due through August of 1981, it was determined that LGJ owed the State $232,291.97. Creditor's Exhibits C & D. Tr. at 124. Tr. II at 37.

14. It was LGJ's standard business and operational procedure to:

(a) Run a "Happy Hour" every day between 3–7 pm, wherein drinks and appetizers were sold at a reduced price. Tr. at 104, 144–46.

(b) Offer a "Sunday Brunch" at a reduced price. Tr. at 146.

(c) "Buy back" customers fourth drink. Tr. at 146.

(d) Offer "free meals" to employees, tradesmen, and special customers. Tr. II at 26.

(e) Purchase its meat in the "shell" rather than as individual steaks. Tr. II at 19–21.

15. The quantum of LGJ's sales was reduced due to:

(a) A loss of 15% of its liquor inventory via spillage. Tr. at 107. Tr. II at 35.

(b) A loss of 7% of its liquor inventory via its buy back policy. Tr. II at 36. Debtor's Exhibit 7.

(c) A loss of 2% of its alcoholic beverage inventory via breakage. Tr. II at 36.

(d) A loss of 10% of its food inventory via spoilage. Debtor's Exhibit 8. Tr. II at 27.

(e) A loss of 8% of its food inventory via theft. Debtor's Exhibit 8. Tr. at 147. Tr. II at 28.

(f) A loss of 8.5% of LGJ's inventory due to the non-salable nature of such

---

1. These figures do not correspond to the amounts adduced at trial. Due to the inconsistency of the record, the Court did it's own tabulation of the tax returns within Debtor's Exhibit 2, as supplemented where necessary by Debtor's Exhibit 1. The tape calculations have been added to the file as the Court's Exhibits 1 & 2.

items as mixers, cooking condiments, and paper products. Tr. at 101, 103. Tr. II at 16, 18, 33.

16. The state's auditor arbitrarily and erroneously estimated LGJ's tax liability for the following reasons:

(a) He used an unreasonably small, one month base to devise his mark-up percentages which he presumed to stay constant over an 18 quarter period. Tr. at 82, 84, 98, 150.

(b) He ignored the debtor's books and business records which were readily available for his examination for the period in question. Tr. at 61.

(c) In his mark-up he utilized food prices which were considerably higher than the prices actually shown on the menus of this debtor. Tr. at 112–116.

(d) In his computations for the 4¼ year tax projection, he gave no consideration to hanging menu prices and inventory costs. Tr. at 134.

(e) His food mark-up was derived from an unrepresentative cross section of only five of approximately forty items involved. Tr. at 89, 97.

(f) His food mark-up was erroneous and unreasonably high since they were based upon the presumption that steaks were purchased individually rather than in the shell. Tr. at 111–112. Tr. II at 35, 74.

(g) His 15% beverage spillage allowance did not adequately take into account LGJ's actual buy back and breakage loss. Tr. at 107. Tr. II at 35, 74.

(h) He failed to take into account LGJ's non-salable inventory. Tr. at 100–104.

(i) He failed to take into account LGJ's Happy Hour and Sunday Brunch policy and practice. Tr. at 104, 108, 116.

(j) His allowance of 10% for spoilage and theft was inadequate. Tr. at 61, 108.

(k) His allowance of 4.8% for LGJ's employee, tradesman and special customer free meal policy was insufficient. Tr. at 67.

17. The State's auditor made no effort to inquire into the various business practices and policies which served to reduce LGJ's total sales. Tr. at 105, 106.

18. LGJ's actual sales for the period of September, 1976 through August of 1981 totalled $2,800,930. No tax is due and owing for the period between August of 1976 through May of 1979. LGJ's outstanding tax liability, which accrued during the period of June, 1979 through August, 1981, is $63,683.97. Debtor's Exhibit 2 & 3. Tr. at 27. Said figure is exclusive of pre-petition interest and penalty charges due.

## CONCLUSIONS OF LAW

1. LGJ having introduced direct and convincing evidence to sustain its objection that its taxable sales were as reported; the State may no longer rely upon any presumption or prima facia case as a result of the filing of its claim and must prove said claim by a fair preponderance of the evidence.

2. Where an entity which is the subject of a State Tax Commission audit has maintained and has available complete sales records; the State's failure to base the audit on said records, and its alternative use of estimated tax liability projections is inherently arbitrary and capricious.

3. The evidence presented demonstrates that the State's audit and assessment procedure ignored the actual business practices of LGJ, was based upon clearly erroneous and arbitrary data, and as such is insufficient to overcome LGJ's uncontradicted testimony that all its sales were accurately recorded and reported.

4. The evidence presented in this case establishes the New York State Tax Commission's claim in the sum of $59,483.97 [2] plus any penalties and interest which were assessed prior to LGJ's filing with this Court.

---

2. This sum is derived by subtracting $4,200 admittedly garnished from the three principals of LGJ. An $1,800 payment made by the trustee had already been figured into the State's amended claim. Tr. at 49.

## MEMORANDUM

■ The filing of the State's proof of claim raises the presumption pursuant to 11 U.S.C. § 502(a) and Bankr.Rule 301(b) that the proof of claim shall constitute prima facia evidence of the validity and amount of the claim. Thereafter it is incumbent upon the debtor to come forward with evidence to controvert the State's claim as filed. LGJ offered proof through the testimony of a Certified Public Accountant, who had been in charge of its books and records during the entire operational period. The accountant stated that the debtor regularly maintained books, records, and accounts of its receipts and disbursements, that the debtor had filed all sales tax returns for the period in question based on said records, and that such returns correctly set forth the debtor's sales tax liability. The debtor's evidence was direct, clear, convincing, and uncontroverted. LGJ's evidence completely negates any presumption which the State's claim may have enjoyed under Rule 301(b). Thereupon it was incumbent upon the State to prove its claim by a fair preponderance of the evidence. *In re Cavanaugh Communities Corp.,* 3 B.C.D. 967 (Bankr.S.D.N.Y. 1977).

The State has offered its "mark-up" calculations as proof of its claim. Such "mark-up" calculations involve projections based upon one month's estimated percentage of sales/costs on LGJ's liquor, beer, and selected food items which were then applied to LGJ's inventory invoices over a 4¼ year period. It is alleged that this manner of sales tax estimation is standard operating procedure.

This Court is familiar with the regularity with which the State resorts to the aforementioned tax estimation practice. Be it standard operating procedure or not, in this case said practice is objectionable both as to the State's decision to utilize the mark-up test, as well as to its method of computation.

■ It is well established law that where there is no insufficiency of record keeping, the taxing authority's resort to projected tax estimates based upon a one month test period, inherently lacks a rational basis and is per se arbitrary and capricious. *See Allied New York Services, Inc. v. Tully,* 83 A.D.2d 727, 442 N.Y.S.2d 624 (3d Dept. 1982); *In re Hard Face Welding & Machine Co. v. State Tax Commission,* 81 A.D.2d 967, 439 N.Y.S.2d 744 (3d Dept.1981); *Mohawk Airlines, Inc. v. Tully,* 75 A.D.2d 249, 429 N.Y.S.2d 759 (3d Dept.1980); *Names in the News, Inc. v. N.Y. State Tax Commission,* 75 A.D.2d 145, 429 N.Y.S.2d 755 (3d Dept. 1980); *In re Chartair, Inc. v. State Tax Commission,* 65 A.D.2d 44, 411 N.Y.S.2d 41 (3d Dept.1978). *See also In re Echo Sound Studio, Inc.,* 75 B 2305 (Bankr.E.D.N.Y. dec. Nov. 21, 1978), aff'd 79 C 116 (E.D.N.Y. dec. Mar. 9, 1979); *In re Segan Entertainment, Inc.,* # 75 B. 2304 (Bankr.E.D.N.Y. dec. June 30, 1977); J. Murphy & E. Brown, "Taxpayers Reap Sales Tax Savings as Estimated Audits Are Voided", *N.Y.S. Bar Journal,* Vol. 54 at 434 (Nov. 1982).

■ In this case the State declined to attempt to verify LGJ's tax liability through examination of its business records. Excepting the waitress guest checks,[3] all of LGJ's business records were available for inspection. The State's distain towards pursuing the more legitimate but time consuming audit procedures is evident from its failure to request LGJ's cash register receipts before utilizing an estimation method. This use of an estimate, prior to determining whether an actual figure could be attained, was an arbitrary decision which offends the state and federal constitutional due process requirements.

For the reasons stated in finding of fact # 16, this Court finds that even if the State had properly decided to use a mark-up estimate, its audit methodology was so

---

**3.** This Court feels no need to address the issue of whether failure to keep guest checks entitles the State to use its alternative estimation methods. Clearly, absent other grounds for suspicion, the availability of the cash register tapes provided a sufficiently verifiable basis so as to preclude an estimation procedure. *See Goldner v. State Tax Commission,* 70 A.D.2d 978, 418 N.Y.S.2d 477 (3d Dept.1979) appl. denied 423 N.Y.S.2d 1025, for supporting precedent.

flawed that any tax liability figure derived therefrom is at best unworthy of belief, and at worst unconstitutionally arbitrary. For similar reasons, this Court will also disregard LGJ's alternative mark-up tax liability estimation.[4] Bearing in mind LGJ's management problems, and based upon the strength of its accountant's testimony, the amounts stated in the filed tax returns are determined to be an accurate assessment of LGJ's tax liability.

■ This Court summarily dismisses the State's argument that LGJ is barred from relitigating its tax liability as it already had redress to the State's administrative procedures. LGJ timely challenged the State's sales tax assessment and requested a hearing. Prior to the demanded hearing, LGJ filed with this Court.[5] The State's assertion that the post-petition settlement discussion held thereafter constituted an administrative adjudication is patently frivolous.

Pursuant to its powers as provided for in 11 U.S.C. § 502(b), § 505(a)(1), and § (d)(3)(A) of the Judicial Conference's Emergency Resolution,[6] as ordered effective December 21, 1982 by the Chief Judge of the District Court for the Eastern District of New York; this Court determines the State's claim to be $59,483.97. As the proceeds from LGJ's estate have already been turned over to the State in satisfaction of the secured portion of its claim,[7] the aforementioned sum, exclusive of any pre-petition penalties and interest,[8] is allowed as an unsecured claim.

Settle order in accordance herewith.

**4.** Utilizing its own "mark-up" test, LGJ determined its sales to be $2,373,858. Such a figure indicates that LGJ had $427,072 fewer sales than it reported. *See* Tr. II at 37.

**5.** At this point 11 U.S.C. § 362 stayed any further administrative action.

**6.** Though bound by the presumed precedential validity of this jurisdictional grant, this Court nonetheless has difficulty reconciling it with the majority opinion in *Northern Pipeline v. Marathon,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), 9 B.C.D. 67.

**7.** See the underlying motion papers filed 4 October, 1982 and the record of the resulting hearing held 4.November, 1982, for the basis of this Order.

**8.** As the State's claim is under-secured, § 506 prohibits post-petition interest thereon. However § 502(b)(2) allows the State its pre-petition charges. *See In re South Shore Vending Inc.,* 25 B.R. 111, 9 B.C.D. 1259 (Bkrtcy.D. Mass.1982). As the record does not indicate the amount of these charges, it is suggested that the parties stipulate to them in the judgment to be presented for signature.