### In re William E. GRAN and Shirley M. Gran, Debtors.

### Bankruptcy No. LR 87–1460M.

United States Bankruptcy Court, E.D. Arkansas, W.D.

Nov. 27, 1989.

---

A.L. Tenney, N. Little Rock, Ark., trustee.

Michael Wilcove, Tax Div., U.S. Dept. of Justice, Washington, D.C., for I.R.S.

Raymond Harrill, Little Rock, Ark., for debtors.

## ORDER

JAMES G. MIXON, Bankruptcy Judge.

On July 29, 1987, William E. Gran and Shirley M. Gran filed a voluntary petition for relief under the provisions of chapter 13 of the United States Bankruptcy Code. On October 13, 1987, the Internal Revenue Service (IRS) filed a claim for the sum of $69,749.40 for unpaid taxes, penalties and interest for personal income taxes for the years 1982 and 1983. On December 16, 1988, the debtors filed an objection to the IRS claim and a hearing on the objection was held April 24, 1989.

The matter before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), and the Court has jurisdiction to enter a final judgment.

I

William Gran (Gran) is a fifty-two year old professor who teaches in the Department of Physics at the University of Arkansas at Little Rock (UALR). Shirley Gran is a registered nurse employed by St. Vincent Infirmary in Little Rock. Gran testified that in the late fall of 1981 or early spring of 1982, Warren Massengill (Massengill) approached him about "looking up some articles" on embryo transfers and cattle production and that he did some research on the subject in the UALR library. Record at 70–71. According to Gran, Massengill was attempting to put together a cattle embryo program at a farm located in Missouri and managed by Johnny Gardner (Gardner). Under a cattle embryo program, fertilized eggs are removed from a superior cow and placed in the reproductive tract of an inferior recipient cow. Gran and Massengill were acquainted although Gran had never met Gardner. After meeting with Gardner's father, Estle Gardner, Gran decided in the fall of 1982 to invest $185,400.00 in Gardner's cattle embryo operation.

Gran executed a promissory note for $185,400.00 payable to Johnny Gardner Ranches. The promissory note was dated November 10, 1982, and 10% of the principal was due on or before December 31, 1982, with the balance due in full on or before November 10, 1987. Gran also executed a management contract with Johnny Gardner Ranches. A bill of sale purporting to convey to Gran "the personal property described in the above-mentioned management contract" was executed by Estle Gardner presumably on behalf of Johnny Gardner. The personal property listed in the management contract consisted of twenty-five registered breeding cows and forty commercial grade recipient cows. Gran testified that he paid the first installment of $18,540.00 on the note by delivery of money orders dated December 23, 1982, to Massengill, who deposited them in a Johnny Gardner Ranches account in a bank in Newark, Arkansas.

According to Gran, he became the owner of the cattle upon the execution of the

documents described above. Gran did not execute any document granting anyone a security interest in the cattle. Gran said that the operation was to be managed by Gardner who was entitled to retain possession of the cattle as long as Gran's note was not paid in full. Gran said that the embryo transplant technique was anticipated to produce superior cattle which would be sold and that ultimately a profit would be realized.

Gran testified that in early 1983 he learned that some of the cows he had purchased from Gardner had been sold to other investors. Although Gran testified that he was "greatly concerned about it," he did nothing of any substance in response to this information other than prepare some vaguely worded correspondence. Record at 81. He testified that Massengill assured him that Gardner would provide replacement cows. Gran testified that in June 1984 and October 1984 he met with the Gardners to discuss the embryo operation but did not discuss the cattle which had allegedly been sold to other investors.

Gran made no payments on his obligation to Gardner other than the down payment of $18,540.00 in 1982. Gran testified that his refusal to make payments was justified because, "I felt that at a very, very minimum that I should have some kind of reports on the status of the investment, the number of calves that had dropped, the number of cows that had been sold, et cetera, et cetera. And no reports were ever given at all." Record at 102–103.

The debtors' 1982 tax return reflected wages and interest income of $52,275.37, total tax due of $.00 and a refund due of $9,791.13. The debtors' 1983 tax return reflected wages and other income of $54,716.99, total tax due of $345.00 and a refund due of $8,158.66. Schedule 4562 filed on both tax returns reflected that forty commercial grade cows were purchased in 1982 for $700.00 each, which the debtors depreciated 15% in 1982 and 22% in 1983.

Schedule 4562 also reflected the purchase of twenty-five registered breeding cows for various prices ranging from $600.00 to $25,000.00 each. These were depreciated in the same manner as the forty cows. The debtors' tax return also claimed as a farm expense a portion of the value [1] of the management contract in the sum of $2,750.00 in 1982 and in the sum of $16,500.00 in 1983.

The debtors claimed total depreciation and expense deductions on their 1982 tax return from the embryo operation of $18,200.00 and an investment tax credit of $1,391.00. They claimed depreciation and expense deductions attributable to the embryo operation of $39,160.00 on their 1983 tax return. The debtors also claimed a depreciation and expense deduction of $38,130.00 for the tax year 1985.[2] The debtors reported no gross income from the embryo operation for any of the years in question or for any other year.

The IRS presents two arguments to support the validity of its claim on the grounds that the debtors were not entitled to the depreciation deductions and investment tax credit claimed on their 1982 and 1983 tax returns. First, the IRS argues that the cattle embryo operation in which the debtors invested should be disregarded because it was a sham transaction concocted purely for tax benefits, rather than constituting a bona fide sale. The IRS's alternative argument is that the depreciation deductions and investment tax credit should be disallowed because the cattle embryo operation was not an activity in which the debtors engaged for profit.

## II

A transaction devoid of economic substance is not required to be recognized for federal tax purposes. *Gregory v. Helvering*, 293 U.S. 465, 469–70, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935); *Cherin v. Commissioner*, 89 T.C. 986, 993 (1987); *Grodt & McKay Realty, Inc. v. Commis-*

---

1. The total value assigned to the management contract was $82,500.00.

2. The taxes due for the year 1985 were not part of the claim filed by the IRS, but evidence of the deductions was received on the issue of the debtors' credibility.

*sioner*, 77 T.C. 1221, 1243 (1981). The tax consequences of transactions are governed by substance rather than form. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978); *Massengill v. Commissioner*, 57 T.C.M. (P–H) ¶ 88,427, at 88–2154, 1988 WL 92145 (1988), *aff'd*, 876 F.2d 616 (8th Cir. 1989). "The labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather, we are concerned with economic realities and not the form employed by the parties." *Houchins v. Commissioner*, 79 T.C. 570, 589 (1982). Whether the purported cattle purchases by the debtors in this case were, in substance, sales for tax purposes is a question of fact. *Leahy v. Commissioner*, 87 T.C. 56, 66 (1986); *Massengill v. Commissioner*, 57 T.C.M. (P–H) at 88–2154 to –2155. A transaction is a sale for tax purposes only if the benefits and burdens of ownership passed from the purported seller to the purported buyer. *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. at 1236–38; *Massengill v. Commissioner*, 57 T.C.M. (P–H) at 88–2155. The following factors have been applied in determining whether a purported sale of cattle is to be recognized as transferring ownership for tax purposes:

(1) Whether legal title passes;

(2) How the parties treat the transaction;

(3) Whether the purported purchaser acquires any equity in the property;

(4) Whether the contract creates a present obligation on the purchaser to make payments;

(5) Whether the right of possession is vested in the purchaser;

(6) Which party bears the risk of loss or damage to the property; and

(7) Which party receives the profits from the operation and sale of the property.

*E.g., Massengill v. Commissioner*, 876 F.2d at 618 n. 6; *Cherin v. Commissioner*, 89 T.C. at 997; *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. at 1237–38.

The Eighth Circuit Court of Appeals recently affirmed a United States Tax Court decision involving the same cattle embryo operation that is involved in this case. *Massengill v. Commissioner*, 57 T.C.M. (P–H) ¶ 88,427 (1988), *aff'd*, 876 F.2d 616 (1989). In that case, the tax court, after a thorough analysis of the transaction in light of the above-mentioned factors, disallowed the depreciation deductions and investment tax credits claimed by the taxpayer.[3] *Id.* at 88–2155 to –2156. In affirming, the Eighth Circuit stated:

The Commissioner is not required to recognize, for tax purposes, those transactions which lack economic substance. *E.g., Gregory v. Helvering*, 293 U.S. 465 [55 S.Ct. 266, 79 L.Ed. 596] (1935). "The presence or absence of economic substance is determined by viewing the objective realities of the transaction, namely, whether what was actually done is what the parties to the transaction purported to do." *Killingsworth v. Commissioner*, 864 F.2d 1214, 1216 (5th Cir. 1989). In assessing the true nature of Massengill's dealings, the Tax Court was called upon to "resolve whether, as a practical matter, those transactions ha[d] any economic impact outside the creation of tax deductions." *Thompson v. Commissioner*, 631 F.2d 642, 646 (9th Cir. 1980), *cert. denied*, 452 U.S. 961 [101 S.Ct. 3110, 69 L.Ed.2d 972] (1981). The court concluded the transactions had no such impact.

Because the Tax Court's conclusions are drawn "more from its experience 'with the mainsprings of human conduct' rather than the application of any legalistic formula," *id.* (quoting *Commissioner v. Duberstein*, 363 U.S. 278, 289–91 [80 S.Ct. 1190, 1198–99, 4 L.Ed.2d 1218] (1960)), this court's review is limited. The question of economic substance is essentially factual, and the Tax Court's finding is not to be disturbed unless clearly erroneous....

The contractual declarations of intent and unequivocal obligation upon which Massengill relies do not dictate a decision

---

**3.** The taxpayer was the same Warren Massengill who is involved in this case.

in his favor. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 573 [98 S.Ct. 1291, 1298, 55 L.Ed.2d 550] (1978) (mere expedient of drafting papers cannot overcome objective economic realities to contrary). Massengill has presented no convincing reason to reject the Tax Court's assessment of the essential nature of the transactions.

876 F.2d at 619.

■ Although Gran testified that he became the owner of the cattle upon execution of the various documents, Gardner retained complete control and possession of the cattle pursuant to the management contract instead of retaining the customary security interest to secure payment of the purchase price. The cattle which Gran purportedly purchased were registered in the name of Johnny Gardner Ranches, rather than in Gran's name, and Gran never attempted to assert any ownership rights in the cattle. Gran did not participate in the embryo operation and has no knowledge of the present location of the cattle he supposedly owns. Although Gran has purportedly invested over $18,000.00 in cash, he has never taken any meaningful action to secure possession of his cattle or enforce the contract. In his bankruptcy petition, Gran did not list the cattle as an asset of his estate nor did he list Gardner as a creditor. Gran made no payments to Gardner other than the down payment of $18,540.00, and Gardner never took any action against Gran to recover the unpaid purchase price. Gran has never seen the cattle he purchased and he agreed to invest $185,400.00 with Gardner without even meeting him. Gran did not participate in the determination of the purchase price of the cattle, which was set by Gardner. Some of the cattle purportedly owned by Gran were listed on Gardner's records as being owned by other people.

Gran has never reported receiving any profits or even gross income from the embryo operation. Gran has a history of filing incorrect tax returns,[4] and the deductions which were claimed exceeded by a substantial amount the capital invested by Gran.[5]

In a true sale, the purchase price should approximate the fair market value of the property being purchased. *Zirker v. Commissioner*, 87 T.C. 970, 976 (1986); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. at 1240–41. The evidence presented regarding value indicates that the debtors' valuation of the cattle was inflated. Ron Daily, an animal husbandry expert who testified for the IRS, visited the ranch in March 1986 to examine the cattle embryo operation. He found fourteen of the original twenty-five registered polled hereford cows listed on the debtors' tax return and "very few" of the forty commercial grade recipient cows. Daily testified that he has often been asked to calculate the value of cattle to years preceding an actual examination of the cattle. He said that such a valuation is based on the present physical appearance of the cow, its pedigree and production record, the fluctuations of the cattle market, and comparable sales for the period in question as reported in industry publications. In his examination of the Gardner ranch, he discovered cattle that were in poor health and of small stature. He testified that the value of the best registered cattle he saw that day was $750.00 per head, as compared to the $600.00 to $25,000.00 values assigned to the cattle on the debtors' tax return. He said that the recipient, or inferior cows, which the debtors valued at $700.00 each,

---

**4.** The debtors' 1977 tax return sought to avoid payment of taxes through a device known as a "family trust." *See Gran v. Commissioner*, 49 T.C.M. (P–H) ¶ 80,558 (1980), *aff'd*, 664 F.2d 199 (8th Cir.1981). Massengill, through whom the current investment was procured, was the trustee of the "William E. Gran Family Equity Pure Trust" which the tax court described as "an agreement whereby [the debtors] purported to convey to the trust the 'ownership' of their services." *Id.* at 80–2371.

The IRS also introduced evidence on cross-examination that the debtors' 1981 tax return reflected no income tax due because Gran did not consider his wages of $26,055.14 from UALR to constitute income.

**5.** The debtors claimed total deductions on their 1982, 1983, and 1985 returns from the $18,540.00 investment of $95,490.00, as well as an investment tax credit of $1,391.00.

would have sold for $350.00 to $400.00 each in 1982.

Daily, who was familiar with cattle embryo transplant procedures, also examined the facilities where the transplants were to occur.[6] He testified in part as follows:

Q Did you ask to see the place where embryo transfers were to be performed?

A I asked to see the embryo center.

Q And what is the embryo center?

A There was no embryo center, there was a barn that had a set of corrals and facilities around it, no lab, no— there is a photograph, here. The back side of the barn.

Q If embryo transfers were to be performed on-site, what would you expect the operation to have?

A I would expect them to have some facility for handling the drugs. The drugs are a key issue in an embryo transplant. I would expect it to have a somewhat sterile environment for—laboratories to do the embryonic work; some place to set up an electron microscope, which is a rather expensive piece of equipment to identify the embryos, and it has to be maintained in a fairly sterile environment.

Q Did you see any facilities for the drugs?

A No.

Q Did you see any sterile environment?

A No.

Q What other equipment would be needed to perform embryo transfers?

A An assortment of liquid nitrogen tanks and catheters to make the removals and the reimplantations of them, general veterinarian supplies that are required to remove the embryos and then place them back in the apparatus for implantation on the recipient cow.

Q Did you form an opinion as to whether Johnny Gardner had the ability,

the facilities, or the expertise to carry out an embryo transfer program?

A Yes, I did.

Q What was that opinion?

A At the time of the inspection and the facilities that were seen, the opinion was formed that Johnny Gardner was not capable of performing embryo transplants at that time.

Q And why was that?

A Because he had no knowledge of the drugs or the procedure that was actually involved. He had no concept of the facilities it was going to take to handle the cattle through the procedure, and what kind of nutritional plane that these cattle were going to be required to have to insure his conception rate would be average in the industry for that period of time.

Record at 162–164.

The evidence undoubtedly establishes that the purported sale of cattle to the debtors was a sham transaction engaged in solely for the purpose of creating fictitious tax deductions. Therefore, it is not necessary to consider the IRS's alternate argument that the debtors did not invest in the operation with the intention of making a profit.

### III

The debtors argue that their objection to the IRS claim should be sustained in any event because the IRS never came forward with evidence to sustain the validity of its claim in response to the debtors' objection. The IRS argues that because a taxpayer involved in civil litigation in district court or tax court always bears the burden of proof, the same allocation of the burden of proof exists in bankruptcy court. In support of this argument, the IRS cites numerous cases, almost all of which were decided before the Bankruptcy Code was adopted in 1979.

A proof of claim filed pursuant to 11 U.S.C. § 501 is deemed allowed by the ex-

---

**6.** In the embryo transplant process the fertilized eggs are removed from a donor cow through a washing process called a flush. The eggs are collected in a petri dish and graded by an embryologist through an electron microscope. The most viable embryos are then either frozen or placed in a recipient cow. Record at 156.

press provisions of 11 U.S.C. § 502 unless a party in interest objects. *See* 3 *Collier on Bankruptcy* ¶ 502.01[2] (15th ed. 1989). Under Bankruptcy Rule 3001(f), the proof of claim constitutes prima facie evidence of the validity and amount of the claim. The Fifth Circuit Court of Appeals in the recent case of *California State Bd. of Equalization v. Official Unsecured Creditors' Comm. (In re Fidelity Holding Co.)*, 837 F.2d 696 (5th Cir.1988), specifically rejected the argument made by the IRS here and held that tax claims are treated the same as other claims for purposes of section 502(a) and Bankruptcy Rule 3001. The allocation of the burden of proof applicable to objections to all claims, including tax claims, was stated by the Fifth Circuit as follows:

> Under Bankruptcy Rule 301(b), a party correctly filing a proof of claim is deemed to have established a prima facie case against the debtor's assets. *In re WHET, Inc.*, 33 B.R. 424, 437 (D.Mass. 1983). The objecting party must then produce evidence rebutting the claimant or else the claimant will prevail. *Id.* at 437. If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to "prove the validity of the claim by a preponderance of the evidence." The ultimate burden of proof always rests upon the claimant. *Id.* This burden does not shift even where the claimant is a state or federal tax authority. *In re Watson*, 456 F.Supp. 432, 435 (S.D.Ga.1978). The Bankruptcy Code, under Rule 301(b), does not differentiate between government and private claimants when proofs of claim are filed. *See, e.g., In re L.G.J. Restaurant*, 27 B.R. 455 [(Bankr.E.D. N.Y.1983)]; *In re Watson*, 456 F.Supp. at 435; *In re Avien*, 390 F.Supp. 1335, 1341–42 (E.D.N.Y.[1975]), *aff'd*, 532 F.2d 273 (2d Cir.1976). The State's argument that the burden of proof rests upon the Committee must therefore be rejected.

*Id.* at 698. *See also In re Butcher*, 100 B.R. 363, 367 (Bankr.E.D.Tenn.1989); *In re Hudson Oil Co.*, 91 B.R. 932, 945 (Bankr. D.Kan.1988); *In re Unimet Corp.*, 74 B.R. 156, 165–66 (Bankr.N.D.Ohio 1987); *In re*

*Fogelberg*, 79 B.R. 368, 372 (Bankr.N.D.Ill. 1986); *In re Ashline*, 37 B.R. 136, 139 (Bankr.N.D.N.Y.1984); *United States v. Coleman American Cos. (In re Coleman American Cos.)*, 26 B.R. 825, 830–31 (Bankr.D.Kan.1983); *In re L.G.J. Restaurant, Inc.*, 27 B.R. 455, 459 (Bankr.E.D.N. Y.1983).

In this case, the IRS proof of claim constituted prima facie evidence of the validity and amount of the claim. 11 U.S.C. § 502(a); Bankruptcy Rule 3001(f). The debtors, as the objecting party, were then required to introduce evidence of facts tending to defeat the claim. The debtors produced evidence concerning the preparation of their 1982 and 1983 personal income tax returns and the basis for the claimed deductions, and then rested. The IRS went forward and introduced evidence which rebutted the correctness of the deductions claimed by the debtors. Notwithstanding the argument by the IRS that the debtors had the burden of proof, the IRS established by convincing evidence that its claim was proper and that the debtors' objection was not credible and was without merit. The debtors' objection to the claim of the IRS is, therefore, overruled.

IT IS SO ORDERED.