TRANS-COASTAL EQUIPMENT LEASING, LTD., ELMER C. PRATT, GENERAL PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Trans-Coastal Equipment Leasing, Ltd. v. Commissioner
Docket Nos. 22378-87; 22379-87; 22380-87; 22381-87; 22382-87; 22383-87; 4235-88; 4236-88
United States Tax Court
T.C. Memo 1990-67; 1990 Tax Ct. Memo LEXIS 67; 58 T.C.M. (CCH) 1379; T.C.M. (RIA) 90067; February 13, 1990
Elmer C. Pratt, for the petitioners. Robert P. Crowther and Kay Hill, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent mailed Notices of Final Partnership Administrative Adjustment ("FPAA") pursuant to section 6223 [2] with respect to related partnerships in these consolidated cases as follows: Partnership
Nature of
Years and Amount of
Name
Adjustments
Adjustments
1983
1984
1985
Trans-Coastal
Disallowance of
$ 1,584,621
$ 1,035,298
Equipment Leasing,
Ordinary Loss
Ltd.
Disallowance of
6,627,078
31,705
Claimed Cost of
Investment Tax
Credit Property
Disallowance of
125,000
39,999
Claimed Cost of
Investment Tax
Credit Property
Gold Exploration,
Disallowance of
3,180,000
60,921
$ 11,562
Ltd. #17
Ordinary Loss
Gold Exploration,
Disallowance of
3,234,610
69,457
12,777
Ltd. #18
Ordinary Loss
*68 In these consolidated cases, the issue for decision is petitioners' entitlement to investment tax credits, depreciation deductions, and other deductions relating to the purported leasing of a dredge and the purported exploration and mining of gold. This case illustrates the important role of a tax matters partner in representing a TEFRA [3] partnership during an audit by respondent and in litigation in this Court. Elmer C. Pratt, the tax matters partner for each of the three partnerships involved herein, failed to present an organized case at trial and failed to file with this Court carefully researched and written legal briefs. Prior to trial, the Court, sua sponte, notified the various limited partners of the litigation, of pretrial problems associated with Mr. Pratt's status as the tax matters partner for the partnerships, and the Court indicated that any motions to designate a new tax matters partner would be entertained. The partners not settling their tax liabilities *69 with respondent chose to rely on Mr. Pratt and to await our decision in these cases. For the reasons stated, our factual findings are made from a difficult record. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner Trans-Coastal Equipment Leasing, Ltd., is a Utah limited partnership formed in 1983 with the stated business purpose of leasing equipment to be used in the exploration of gold mining claims. Petitioners Gold Exploration, Ltd., No. 17 and Gold Exploration, Ltd., No. 18 are Utah limited partnerships formed in 1983 with the stated business purpose of exploring mining claims. The equipment leasing and exploration activities of the partnerships related to certain gold exploration claims pertaining to property located in the waters off the coast of Nome, Alaska. At the time the petitions in these consolidated cases were filed, the principal place of business of each of the limited partnerships was in Salt Lake City, Utah. The promoter and general partner of each of the three limited partnerships was and is Elmer *70 C. Pratt. Mr. Pratt also was and is the designated tax matters partner for each of the limited partnerships. A partial understanding of the background of Elmer C. Pratt is appropriate. He grew up in rural areas of the Pacific Northwest. As a child working with his father, Mr. Pratt had some limited experience mining for gold. As a teenager, he worked in his family's ranching and logging businesses. Mr. Pratt's formal education, for the most part, ended in 1948 upon graduation from high school. He continued working in the logging business until 1965 when business difficulties forced him into bankruptcy. Seeking a new start, Mr. Pratt moved to Alaska in 1965 and began earning a living by preparing income tax returns, providing tax planning advice, and selling tax shelters. In 1983, Mr. Pratt and Jim Lawler, for whom Mr. Pratt had prepared tax returns, discussed the prospect of organizing a gold exploration project relating to 28 exploration or mining claims Mr. Lawler had subleased from a Canadian company and to exploration or mining permits Mr. Lawler had obtained from the State of Alaska with respect to the waters off of Nome, Alaska. During the years in issue, Mr. Lawler *71 also was an on-site oil field manager for Arco Alaska, Inc.
In June of 1983, Mr. Pratt, with the assistance of an attorney named Richard C. Landerman, began to promote, and he subsequently became the sole general partner of, various limited partnerships formed as tax shelter investments with the stated purpose of engaging in equipment leasing and offshore gold exploration and mining activities that were to use Mr. Lawler's exploration or mining claims and permits. Three of the limited partnerships were known as Trans-Coastal Equipment Leasing, Ltd. ("Trans-Coastal"), Gold Exploration, Ltd., No. 17 ("Gold Exploration 17"), and Gold Exploration, Ltd., No. 18 ("Gold Exploration 18"), petitioners in these consolidated cases. Trans-Coastal
The stated purpose of Trans-Coastal was to acquire and lease mining equipment. Thirty-five limited partnership units in Trans-Coastal were to be sold. Each unit represented a cash investment of $ 60,000, reflecting total anticipated invested capital in Trans-Coastal of $ 2,100,000, if all partnership units were sold. Each limited partner also was to assume a pro rata share of partnership debt obligations. The record does not clearly *72 indicate how many partnership units in Trans-Coastal actually were sold. The private placement memorandum relating to Trans-Coastal does not include economic projections or any other financial information projecting cash flow or profits of Trans-Coastal. The most that is said in the private placement memorandum in that regard is the following, "The General Partner intends to seek a reasonable current return on invested funds * * *." The private placement memorandum relating to Trans-Coastal emphasized tax aspects of the proposed investments. Gold Exploration 17 and 18
Gold Exploration, Ltd. ("Gold Exploration"), a Utah limited partnership, served as a master or model partnership for a series of partnerships, including Gold Exploration 17 and 18, each of which was to be formed for the purpose of investing in the exploration of one of the mining claims and permits held by Mr. Lawler. Apparently, 35 limited partnership units were to be sold with respect to each partnership. Each partnership unit was to represent a cash investment of $ 15,000, reflecting an anticipated total cash investment in each partnership of $ 525,000. Each investor also was to assume personal liability *73 for a pro rata share of partnership debt obligations. The record does not indicate how many limited partnership units in the various partnerships actually were sold. The private placement memorandum of Gold Exploration contained what were described as "hypothetical" projections of cash flow, revenues, and profits of each partnership to be formed. During 1983, when the partnerships were being formed and when partnership units were being sold, no feasibility or market studies were prepared with respect to the gold exploration or mining activities of Gold Exploration, nor of Gold Exploration 17 or 18. The private placement memorandum relating to Gold Exploration also emphasized tax aspects of the proposed investments. In managing the partnerships, Mr. Pratt intermingled the funds of Gold Exploration, Gold Exploration 17, and Gold Exploration 18. For example, Mr. Pratt made payments on behalf of Gold Exploration 17 and 18 with checks drawn on a bank account held in the name of Gold Exploration. Acquisition of a Dredge
In June and July of 1983, Mr. Pratt, Mr. Lawler, and an individual named Max Mott negotiated for the purchase of a dredge with Ike Arnn of Arnco, Inc. *74 ("Arnco"), a company doing business in Arizona and Nevada. Mr. Mott is a geologist in Alaska whose consulting services apparently were sought by Mr. Pratt and Mr. Lawler with regard to the contemplated offshore exploration and mining activities. With regard to the negotiations with Arnco, Mr. Pratt claims that he acted on behalf of an entity known as Bonneville Equipment Corp. ("Bonneville"), a Nevada corporation, and that Mr. Lawler and Mr. Mott acted on behalf of themselves. On July 4, 1983, Mr. Pratt, on behalf of Bonneville, allegedly reached an agreement with Arnco under which Arnco was to sell the dredge to Bonneville. The alleged purchase price of the dredge is the subject of litigation in another court. For purposes of this case, however, Bonneville apparently was to pay Arnco either $ 1 million in cash or $ 600,000 in cash along with a partnership interest in Trans-Coastal with a stated value of $ 600,000. Bonneville was to purchase the dredge for immediate resale to Trans-Coastal. Mr. Lawler paid several thousand dollars to Arnco as a deposit on Bonneville's purported purchase of the dredge. At the time of the negotiations, Mr. Mott appraised the value of the dredge *75 at $ 900,000. In October and November of 1983, Mr. Pratt signed various checks in the total amount of $ 552,000, drawn on a Trans-Coastal bank account and all made payable to Bonneville. The word "Equipment" was reflected on the memo line of each check. These funds apparently were used by Bonneville to pay Arnco a portion of the alleged purchase price for the dredge. Delivery and Testing of the Dredge
According to Mr. Pratt, Arnco, as part of the alleged purchase agreement with Bonneville, was to transport the dredge to a site in southern Utah for testing. The dredge, however, was transported in late 1983 to the Yuba River in California. Bonneville never took possession of the dredge. Mr. Pratt considered Trans-Coastal the owner of the dredge at the time the dredge was delivered in California. The record contains no evidence that insurance was obtained on the dredge by or for the benefit of Bonneville or Trans-Coastal. Apparently on its delivery in California, there was no place to store the dredge. The United States Forest Service eventually granted Mr. Pratt a temporary permit to store the dredge at a designated place on the Yuba River. Also, according to Mr. *76 Pratt, the person or entity that transported the dredge to California allegedly hijacked the dredge and held it for ransom. Mr. Pratt claims he paid the ransom in February of 1984 and recovered the dredge. During February and March of 1984, the dredge was tested. By April of 1984, Bonneville had paid Arnco a total of approximately $ 600,000 toward the alleged purchase price of the dredge. Arnco then sued Mr. Pratt and Bonneville for the balance due on the dredge plus damages. The outcome of that lawsuit is not disclosed in the record. Purported Sale of Dredge to Trans-Coastal
On December 14, 1983, Bonneville allegedly sold the dredge to Trans-Coastal for a stated purchase price of $ 6,225,000. Initially, Trans-Coastal made a $ 600,000 cash downpayment on the purchase of the dredge and financed the balance purportedly owed Bonneville with a promissory note. At the time Trans-Coastal allegedly purchased the dredge, Mr. Pratt was aware of the stated terms of the alleged sale transaction between Arnco and Bonneville, and he also knew that Mr. Mott had appraised the value of the dredge at $ 900,000. The difference of approximately $ 5 million between the amount Bonneville *77 allegedly agreed to pay for the dredge and the amount Trans-Coastal allegedly agreed to pay for the dredge represented, according to Mr. Pratt, the value to Trans-Coastal of Bonneville's alleged obligations to transport the dredge to Alaska and to assist Trans-Coastal in the operation of the dredge. No written contract or agreement was executed reflecting the terms of the purported purchase of the dredge by Trans-Coastal from Bonneville. There is in the record a bill of sale reflecting the purported sale of the dredge to Trans-Coastal for $ 6,225,000 and a promissory note executed by Trans-Coastal reflecting Trans-Coastal's purported debt obligation of $ 5,625,000 relating to the alleged purchase. Under the terms of the note, interest is to accrue on the outstanding balance of the note at 10 percent per year, and payment of the principal and interest are due no later than July 31, 1995. Apparently, Trans-Coastal made a $ 600,000 payment on the note sometime in 1984 and a $ 20,000 payment on the note in 1988. No other payments have been made. In August of 1984, a shipping company hired by Mr. Pratt transported the dredge from California to Alaska at a cost to Mr. Pratt of approximately *78 $ 50,000. Bonneville apparently did not honor its alleged obligation to transport the dredge to Alaska and to assist in its operation, nor did Trans-Coastal take any legal action against Bonneville. Use of the Dredge
In Alaska, the dredge was leased to a company by the name of Coastal Exploration, Inc. ("Coastal Exploration"), a company apparently owned by Mr. Lawler. The 28 subleases and exploration permits owned by Mr. Lawler authorized him or his company to explore the commercial mining potential of the claims but apparently did not technically permit him or his company to commercially mine the claims. It appears, however, that under the mining or exploration claims and permits, Mr. Lawler and Coastal Exploration were entitled to retain any gold recovered in the process of dredging the ocean floor in the course of its exploration activities. The sale of gold recovered in such manner apparently was to be the source of income allegedly anticipated by Coastal Exploration, Trans-Coastal, Gold Exploration 17 and 18, and the other partnerships. Prior to agreeing to lease the dredge to Coastal Exploration, Mr. Pratt did not obtain any credible appraisals or other opinions *79 concerning the value of the exploration permits held by Mr. Lawler, and Mr. Pratt did not determine Mr. Lawler's credit-worthiness. After the dredge was leased to Coastal Exploration, the dredge was used briefly during 1984 in connection with the above-described exploration activities. After a month or two of dredging operations, a barge collided with the dredge and damaged it. The dredge was repaired, but it was not used again until May of 1987. Petitioners presented no credible evidence that any gold was recovered through use of the dredge. Mr. Lawler and Coastal Exploration were to make lease payments to Trans-Coastal for the use of the dredge based on the amount of gold recovered through the dredging operation. No lease payments actually were made by Mr. Lawler or Coastal Exploration to Trans-Coastal. In May of 1987, Mr. Lawler arranged to sublease the dredge to a third party. Under the terms of the sublease, the third party paid Mr. Lawler a substantial deposit and monthly payments were due in the amount of $ 10,000. The monthly payments that were due were not contingent on whether gold or other mineral actually was mined. Of the payments Mr. Lawler received on this *80 sublease, $ 20,000 was forwarded at Mr. Pratt's direction to Bonneville with respect to Trans-Coastal's note to Bonneville. Miscellaneous Equipment Acquired by Trans-Coastal
Trans-Coastal acquired in 1983 a car, a motor home, a pickup truck, mining equipment, and a storage container. During the years in issue, Mr. Pratt used the car and the motor home for personal use. The record contains no evidence that Mr. Pratt paid any consideration to Trans-Coastal for his personal use of the car and the motor home. The cost of this equipment has not been substantiated. Alaska Geological Research Corp.
Alaska Geological Research Corp., Inc. ("AGR") was incorporated as an Alaskan corporation on January 10, 1984. The record is not clear as to the ownership or corporate officers of AGR, but Mr. Pratt controlled and managed all aspects of AGR's business. The purpose of AGR apparently was to manage the investment activities and funds in Alaska of Gold Exploration, Gold Exploration 17, Gold Exploration 18, and of the other partnerships to be formed. However, no written agreement existed reflecting AGR's responsibilities or duties vis-a-vis the other entities. Through *81 AGR, funds invested by the limited partners in Gold Exploration 17 and 18 were provided to Mr. Lawler and Coastal Exploration to provide operating funds for Mr. Lawler's dredging activities. Gold Exploration 17 and 18 were to receive a percentage of the gold recovered by Coastal Exploration on two of its claims in exchange for funding the dredging operation. On November 1, 1983, Mr. Pratt, as general partner of Gold Exploration and/or Gold Exploration 17 and 18, executed three promissory notes in favor of AGR in the respective amounts of $ 2,751,000, $ 2,751,000, and $ 390,000. The notes were due on July 1, 1995, at 10-percent interest per year. The record is not clear as to the purpose of these notes nor as to the consideration received in exchange for the notes. Various checks of Gold Exploration were given to AGR in November and December of 1983, purportedly to assist Coastal Exploration in its dredging activities. The source of the funds used to cover the checks is unclear. Funds were transferred through a number of bank accounts held in the names of the various partnerships and corporations controlled by Mr. Pratt in multiple and simultaneous bank transactions in an apparent *82 attempt to create the appearance of bona fide payments of much larger sums of money. Trans-Coastal's Forms 1065 Federal Partnership Returns
On its Forms 1065 Federal partnership returns for 1983 and 1984, Trans-Coastal reported, under the accrual method of accounting, gross income, deductions for depreciation and other expenses, and net losses as follows: 1983
1984
Gross Income
$       750 $   366,443 Deductions:
Depreciation
962,185 556,225 Interest Expense
94,604 834,712 Administrative Expense
525,000 Office Expense
15 19 Contracted Services
1,900 Amortization
1,667 Bank Charges
34 Commissions Paid
400 Insurance
200 Organizational Costs
10,000 Miscellaneous
150 Net Losses
($ 1,584,621)
($ 1,035,297)
Forms K-1 attached to Trans-Coastal's 1983 and 1984 Federal partnership returns reflected a claimed unadjusted basis with respect to new recovery property eligible for the investment tax credit of $ 6,627,078 for 1983 and $ 31,705 for 1984 and a claimed unadjusted basis with respect to used recovery property eligible for the *83 investment tax credit of $ 125,000 for 1983 and $ 39,999 for 1984. Of the $ 366,443 in gross income reported by Trans-Coastal for 1984, $ 41,063 represented lease payments received and $ 306,880 represented accrued interest. The record contains no evidence that Trans-Coastal received such interest. During 1983 and 1984, Trans-Coastal earned no gross income with respect to the gold exploration or mining claims in Alaska. Gold Exploration 17's Forms 1065 Federal Partnership Returns
On its Forms 1065 Federal partnership returns for 1983, 1984, and 1985, Gold Exploration 17 reported, under the cash method of accounting, gross income, deductions for depreciation and other expenses, and net losses, as follows: 1983
1984
1985
Gross Income
$ 24,110 Deductions:
Interest Expense
13,000 Administrative Expense
$    30,000 66,881 $     52 Business Entertainment
10 Exploration Costs
3,150,000 Commission Paid
150 Organizational Costs
5,000 5,000 Royalty
6,500 Net Losses
($ 3,180,000)
($ 60,921)
($ 11,562)
The exploration expenses of $ 3,150,000 claimed for *84 1983 related to the checks and the promissory notes Mr. Pratt made and executed as general partner of Gold Exploration in favor of AGR. During the years in issue, Gold Exploration 17 reported no gross income relating to the gold exploration and mining claims in Alaska. Gold Exploration 18's Forms 1065 Federal Partnership Returns
On its Forms 1065 Federal partnership returns for 1983, 1984, and 1985, Gold Exploration 18 reported, under the cash method of accounting, gross income, deductions for depreciation and other expenses, and net losses, as follows: 1983
1984
1985
Gross Income
$  6,745 Deductions:
Interest Expense
$     4,585 Administrative Expense
80,000 70,672 $  1,238 Office Expense
15 80 Exploration Costs
3,150,000 Bank Charges
10 39 Commission Paid
450 Organizational Costs
5,000 5,000 Royalty
6,500 Net Losses
($ 3,234,610)
($ 69,457)
($ 12,777)
The exploration expenses of $ 3,150,000 claimed for 1983 related to cash payments and the promissory notes Mr. Pratt executed as general partner of Gold Exploration in favor of AGR. Gold *85 Exploration 18 reported no gross income relating to the gold exploration and mining claims in Alaska. On audit, respondent disallowed all deductions and investment tax credits claimed by Trans-Coastal, and by Gold Exploration 17 and 18. OPINION Trans-Coastal
With respect to investment tax credits, depreciation deductions, and other deductions claimed by Trans-Coastal, respondent argues that the purported purchase of the dredge by Trans-Coastal was not a bona fide, arm's-length transaction for Federal tax purposes. Respondent therefore argues that Trans-Coastal never acquired an interest in the dredge that would entitle investors in Trans-Coastal to any deductions or investment tax credits relating to ownership of the dredge. Respondent also argues that Trans-Coastal failed to meet its burden of substantiating expenses necessary to establish entitlement to the other deductions claimed. Respondent also argues that Trans-Coastal did not engage in leasing activities with an actual and honest profit objective under section 183. Petitioners argue summarily that the transaction was what it purported to be and that all deductions claimed are allowable. In determining whether *86 Trans-Coastal's transaction with Bonneville constituted a valid purchase for Federal income tax purposes, we must decide whether the benefits and burdens of ownership of the dredge passed to Trans-Coastal. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). See also Falsetti v. Commissioner, 85 T.C. 332, 348 (1985). This question is factual in nature and must be ascertained from the intention of the parties as evidenced by the relevant documents read in light of the relevant facts and circumstances. Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956); Falsetti v. Commissioner, 85 T.C. at 348; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237. In Grodt v. McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237-1238, we enumerated several factors to analyze in determining whether a transaction constituted a sale or purchase for Federal income tax purposes, as follows: (1) Whether legal title passed; (2) how the *87 parties treated the transaction; (3) whether an equity was acquired in the property; (4) whether the transaction created a present obligation on the seller to execute and deliver the property and a present obligation on the purchaser to make payments; (5) whether the right of possession was vested in the purchaser; (6) which party paid property taxes; (7) which party bore risks of loss or damage associated with the property; and (8) which party received profits from the operation and sale of the property. See also Falsetti v. Commissioner, 85 T.C. at 348. Another factor relevant to the determination is the presence or absence of arm's-length dealing. Falsetti v. Commissioner, 85 T.C. at 348 citing Estate of Franklin v. Commissioner, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). Mr. Pratt, on behalf of Trans-Coastal, claims to have purchased the dredge for $ 6,225,000, even though Mr. Pratt knew the dredge was appraised at $ 900,000 and even though he knew of Bonneville's purported purchase of the dredge for $ 1.2 million. Mr. Pratt's explanation for the inflated purchase price (namely, that the $ 5.05 *88 million increase in Trans-Coastal's stated purchase price for the dredge over Bonneville's stated purchase price for the dredge reflected Bonneville's alleged obligations to transport the dredge to Alaska and to assist in its operation) is incredible. Bonneville never assisted Trans-Coastal in moving or operating the dredge, and Trans-Coastal took no actions to enforce Bonneville's purported obligations in that regard. One attribute of an arm's-length sale is a purchase price at least approximately equal to fair market value. The grossly inflated purchase price Trans-Coastal agreed to pay for the dredge weighs heavily against petitioners' contention that Trans-Coastal made a valid purchase of the dredge for Federal income tax purposes. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1240-1241. Trans-Coastal's proposed acquisition of the dredge with a grossly inflated tax basis was merely an attempt to enable the limited partners of Trans-Coastal to claim inflated depreciation deductions and investment tax credits. Because Mr. Pratt controlled both Bonneville and Trans-Coastal, it is likely that Trans-Coastal could abandon its substantial debt obligations *89 to Bonneville relating to the purported purchase of the dredge without consequence. In order for Trans-Coastal to pay Bonneville for the dredge and to make a profit, Trans-Coastal needed to earn millions of dollars in lease revenues. No good faith effort was made to determine whether the gold exploration and mining claims and permits for which the dredge was to be used could realistically produce such revenues. The lease agreement between Trans-Coastal, Coastal Exploration, and Mr. Lawler was not an arm's-length agreement. Lease payments were contingent on the recovery of significant amounts of gold from the dredging operations. Mr. Lawler operated the dredge only for a short time. The evidence does not indicate that any gold was recovered. No lease payments were made to Trans-Coastal for the use of the dredge. The structure of the financing of the purported purchase of the dredge by Trans-Coastal was illusory and compliance with the terms of the unwritten purchase agreement was minimal. There was no substance to the purported transaction between Bonneville and Trans-Coastal apart from the desired tax benefits. Mr. Pratt, the promoter and general partner of Trans-Coastal, *90 had virtually no knowledge or experience with respect to equipment leasing. Notably absent from the private placement memorandum relating to Trans-Coastal was a discussion of profits investors could expect to earn from investments in Trans-Coastal. We conclude that Trans-Coastal's purported purchase of the dredge cannot be recognized as a purchase for Federal income tax purposes. The transaction was a sham in substance, and the tax benefits claimed with respect thereto are disallowed. Falsetti v. Commissioner, 85 T.C. at 346-355; Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1236-1246. See also Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184 (1983), affd. in part 752 F.2d 89 (4th Cir. 1985). Petitioners also failed to meet their burden of substantiating all other expenses claimed with respect to Trans-Coastal for the years in issue. Rule 142(a). See also sec. 1.6001-1(a), Income Tax Regs. Respondent's adjustments with respect to Trans-Coastal are sustained in their entirety. Gold Exploration 17 and 18
With respect to the investment tax credits, depreciation *91 deductions, and other deductions claimed by Gold Exploration 17 and 18, respondent argues that the partnerships engaged in sham transactions not recognizable for Federal income tax purposes. Respondent also argues that the partnerships failed to meet their burden of substantiating the claimed expenses. Respondent also argues that the partnerships did not engage in activities with an actual an honest profit objective under section 183. For Federal income tax purposes, transactions will be regarded as shams and will be disregarded where they are entered into for the sole purpose of obtaining tax benefits and where the transactions are devoid of economic substance because no reasonable opportunity for economic profit exists apart from tax benefits. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 209-210. An examination into the business purpose and economic substance of transactions is factual in nature. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 203. Taxpayers have the burden of proving that they entered into the transactions at issue *92 with a business purpose other than obtaining tax benefits and that the transactions had economic substance apart from tax benefits. Rule 142(a); Larsen v. Commissioner, 89 T.C. 1229, 1253 (1987). In analyzing transactions for Federal income tax purposes, the substance of the transactions controls, not their form. Gregory v. Helvering, 293 U.S. 465, 469 (1935). The business purpose inquiry concerns taxpayers' subjective motives for entering into the transactions. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 203. The economic substance inquiry involves an analysis of objective factors that bear upon whether the transactions had a reasonable opportunity of producing a profit apart from tax benefits. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 94; Levy v. Commissioner, 91 T.C. 838, 854 (1988). We conclude that Gold Exploration 17 and 18 entered into the transactions in question with no valid business purpose apart from obtaining tax benefits. Our conclusion is based primarily on the following findings: (1) Mr. Pratt, the general partner, had virtually no gold mining experience, *93 and he failed to research seriously the practical and financial viability of dredging for gold; (2) the transactions were not entered into at arm's length; (3) the private placement memoranda for the partnerships heavily emphasized tax benefits of the investments; (4) the claims and permits held by Mr. Lawler and on which, among other things, the profits of the partnerships were dependent, entitled Mr. Lawler and Coastal Exploration only to explore but not to commercially mine for gold; (5) the prospect of any significant quantities of gold being recovered from exploration of the claims held by Mr. Lawler was highly speculative; and (6) the non-businesslike manner by which the activities of the partnerships were conducted. We also conclude that the transactions between Gold Exploration 17 and 18 and AGR were devoid of economic substance. In order for Gold Exploration 17 and 18 to earn a profit, substantial returns were required on these purported investments. Such returns were purely speculative and did not reflect true economic transactions that we can recognize for Federal income tax purposes. In fact, Gold Exploration 17 and 18 earned no gross income from the exploration of *94 the gold claims in Alaska. The transactions Gold Exploration 17 and 18 entered into with AGR, and with Mr. Lawler and Coastal Exploration constituted sham transactions that cannot be recognized for Federal income tax purposes. Because of the terms of the purported partnership notes, the unlikelihood of repayment of the notes, the lack of arm's-length dealing between the parties to the notes, the lack of a written agreement between AGR, Mr. Lawler, and Coastal Exploration, and the lack of collateral for the notes, we conclude that the notes of Gold Exploration 17 and 18 at issue in this case are to be disregarded for Federal income tax purposes. The notes do not represent genuine debt obligations. Horn v. Commissioner, 90 T.C. 908, 938-940 (1988). The checks of Gold Exploration also are to be disregarded because they do not represent actual payment of funds, but only the movement of money or checking account entries among entities controlled by Mr. Pratt. Petitioners failed to meet their burden of substantiating all other expenses claimed with respect to Gold Exploration 17 and 18 for the years in issue. Respondent's adjustments with respect to Gold Exploration *95 17 and 18 are sustained in their entirety. Rule 142(a). See also sec. 1.6001-1(a), Income Tax Regs.
Decisions will be entered for the respondent. Footnotes
1. Cases of the following petitioners are consolidated herein: Trans-Coastal Equipment Leasing, Ltd., docket Nos. 22378-87 and 22380-87; Gold Exploration, Ltd. #17, docket Nos. 22381-87, 22382-87, and 4235-88; Gold Exploration, Ltd. #18, docket Nos. 22379-87, 22383-87, and 4236-88.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. "TEFRA" is the acronym for the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 648.↩